IN RE DANCY DRAINAGE DISTRICT: DANCY DRAINAGE DISTRICT and others, Respondents, vs. HANCHETT BOND COMPANY and others, Appellants.

*April 3—June 4, 1929.*

86

For the appellant Portage County there was a brief by *W. B. Murat,* district attorney, and *W. E. Atwell* of Stevens Point, special counsel, and oral argument by *Mr. Atwell.*

*B. M. Vaughan* of Wisconsin Rapids for the appellant Hanchett Bond Company.

For the respondent Dancy Drainage District Commissioners there was a brief by *Bird, Smith, Okoneski & Puchner* of Wausau.

For the respondent Marathon County there was a brief by *G. J. Boileau,* district attorney.

For the respondents First Wisconsin Company and Walter E. Kleimenhagen there were briefs by *Goggins, Brazeau & Graves* of Wisconsin Rapids, and for the respondents Federal Life Insurance Company, Loyal American Life Insurance Company, and Christopher Graham, by *Mason & Priestley* of Madison, attorneys, and *S. W. Dixon* of Chicago, of counsel, and oral argument by *Theo. Brazeau* and *T. M. Priestley.*

A brief was also filed by *Wood, Warner & Tyrrell* of Milwaukee, as *amici curiæ.*

OWEN, J. Following the *remittitur* of the record pursuant to the mandate of this court in *In re Dancy Drainage District,* 193 Wis. 118, 213 N. W. 885, certain holders of bonds of the Dancy Drainage District made application to

the circuit court for Marathon county for an order directing the treasurers of the counties of Marathon, Wood, and Portage to sell at public auction the lands of said drainage district falling within the calls of sec. 89.37 (4) (d), set forth in the margin.[1] The court then made an additional assessment for construction against the lands equal to the total assessed benefits and ordered the sale. The sales were conducted by the respective county treasurers, reports of such sales were made, and on motion, and notice to all parties interested, such sales were confirmed and distribution of the proceeds directed by order of the court. Portage County and the Hanchett Bond Company have appealed from that order. The interest of Portage County arises from the fact that prior to the sale that county had taken tax deeds based on general tax certificates on the lands lying within said drainage district in said Portage County. The court determined that these tax deeds operated as a payment of the general taxes against said land and that Portage County was not entitled to any of the proceeds arising from such sale. Upon

---

[1] (d) In case that any of the lands so bid in by the county shall have not been redeemed or certificates assigned within the period prescribed by the statutes relating to general taxation, the circuit court may, upon the application of the county, the commissioners, or of any creditor or bondholder of the drainage district within which said lands are located, direct the treasurer of such county to offer said lands for sale at public auction, in such manner as the court shall direct, and notice of such sale shall be served upon the parties interested by publication once each week for three successive weeks in a newspaper published in the county, by posting in five public places in the drainage district and by mailing a copy of the notice to each interested party whose postoffice address is known or can by reasonable inquiry be ascertained and to the secretary and clerk of each corporation affected. Report shall be made and deed issued in the manner provided by sections 278.16 and 278.17, and from the moneys received from the sale of said lands the county treasurer shall first deduct any unpaid general taxes due the county and the costs of such proceedings, and shall pay the balance of such moneys in the manner and to such creditors or bondholders as the court shall direct. When lands shall have been finally sold under order of the court as provided herein, they shall be released from all lien of assessments levied prior to the time of such sale.

this appeal the county attacks the constitutionality of sec. 89.37 (4) (d), asserting it to be a private and local law contravening sec. 31, art. IV, State Constitution, prohibiting special or private laws for granting corporate powers or privileges, except to cities, or for assessment or collection of taxes, and sec. 23, art. IV, providing that the legislature shall establish but one system of town and county government, which shall be as nearly uniform as practicable.

These contentions must fail. The act in question is clearly a general law and, in common with the other provisions of the drainage law, applies to all parts of the state. Counsel cites and relies upon *State ex rel. Baltzell v. Stewart*, 74 Wis. 620, 43 N. W. 947, where a drainage law applying only to Dane county was held to be a special law and void. The only analogy between the present law and the law there considered is that they both relate to the subject of drainage. Our present drainage law, however, is state-wide in its application and its provisions may be invoked anywhere within the boundaries of the state. Sec. 89.37 (4) (d) may be invoked anywhere within the state where situations arise falling within its purview. Such an act cannot be considered as a special, local, or private law.

It is next contended that, granting the constitutionality of the law, the court violated its provisions in denying to Portage County any portion of the proceeds of the sale for the general taxes due the county upon the lands upon which it had taken a tax deed. It is here conceded and later determined that the lien of general taxes is superior to the lien of special drainage assessments, and that upon a sale of lands under the provisions of sec. 89.37 (4) (d) there should first be deducted "any unpaid general tax due the county." Such are the explicit provisions of sec. 89.37 (4) (d). The court withheld from the county the general taxes claimed, because the taking of the tax deed by the county extinguished the tax. There was no tax due the county. This is held in

*Spooner v. Washburn County,* 124 Wis. 24, 102 N. W. 325, in which it was specifically decided that by taking a tax deed it was the duty of the county to settle with the town not only for delinquent taxes represented by the certificate upon which the tax deed was taken, but upon all subsequent certificates held by it upon the same lands, and in *Van Ostrand v. Cole,* 131 Wis. 446, 110 N. W. 891, we find in the statement of facts the assertion that "The lands were sold to the county for the delinquent taxes of these years, and the defendant acquired title through the quitclaim deeds above described to the interest of the county in the lands and the tax certificates which the county held at the time." In view of these authorities, the proposition that the taking of a tax deed by the county operates as an extinguishment of the tax represented by certificates then held by the county cannot be regarded as an open question. The county saw fit to exchange its tax certificates for such title to the land as it could acquire by virtue of a tax deed, but that tax deed did not operate to extinguish the special drainage assessment. By sec. 89.37 (5) it is provided that "No tax deed shall cut off any drainage assessment nor shall any drainage assessment deed cut off any tax." The title acquired by the county, therefore, by virtue of its tax deed issued pursuant to general tax certificates was burdened by the lien of the special drainage assessments, and in order to protect its title it was incumbent upon the county to discharge such liens. Whether it possessed power to do that we do not inquire, but, at any rate, it is plain that the taking of the tax deed extinguished the general taxes, that it did not extinguish the special drainage assessments, and that by virtue of the sale the county has lost both its taxes and its land.

However, another question is presented which perhaps is not so clear. Some of the tax deeds upon these lands were taken by the county in April, 1928. They were assessed for general taxes in 1927 and returned delinquent in 1928, and

but for the taking of the tax deeds they were subject to sale for such delinquent taxes in May, 1928. While we have determined that the taking of the tax deed in April extinguished the lien of the general taxes represented by tax certificates already issued, what about the lien for the taxes levied in 1927 for which no certificate was issued at the time of the taking of the tax deed? Lands upon which the county holds tax certificates continue subject to taxation until a tax deed is taken. Sec. 75.32, Stats. The lands were therefore taxable in 1927. They were returned delinquent, and before the time of the sale of lands for delinquent taxes the county obtained title to the land by reason of the tax deeds issued in the month of April. What became of the lien of that tax? Such lien, if it existed, belonged to the county. But it was a lien upon its own land. If a tax certificate could issue thereon at all, it could issue only to the county. Sec. 75.32, Stats. None other could purchase the tax certificate or acquire any lien on the land or any other title thereto by virtue or reason of these delinquent taxes. So far as towns and school districts were concerned, an impasse had arisen with reference to the collection of these taxes. Nothing further could be done. What then had become of them? It seems plain that they had merged with the county's title to the land and that they have the same status that they would have if the tax deed had issued a few days after instead of a few days before the sale of such land for delinquent taxes. From this it follows that the claim of the county for the amount of the taxes of 1927, delinquent in 1928, was properly disallowed by the court.

The county further complains that the court improperly allowed ten per cent. interest upon the outstanding drainage certificates. At the time the drainage certificates in question were issued the statute specifically provided that they should draw interest at the rate of ten per cent. per annum (sec. 89.37 (4) and (6), Stats. 1925), and by ch. 531,

Laws of 1927, it was provided that "drainage certificates that have been held by the county treasurer until three years old shall bear from their date only six per cent. interest per annum and shall be sold for their face plus such interest." To make this provision applicable to existing drainage certificates it must be given retroactive effect. Courts will not construe statutes so as to give them retroactive effect unless that purpose on the part of the legislature plainly appears. *Building Height Cases,* 181 Wis. 519, 195 N. W. 544. Such a purpose does not appear upon the face of this legislation. In the history of this state the interest upon certificates has been twice reduced, once from twenty-five to fifteen per cent. and once from fifteen to ten per cent. The question of whether either of those reductions applied to existing certificates does not seem to have been considered by this court. However, sec. 75.01 (2) authorizes county boards to change the statutory rate of interest which said certificates shall bear to a rate not exceeding fifteen per cent. per annum, but it provides that the "interest to be paid on any such certificate at the time of redemption thereof shall be determined by the rate in force at the time such certificate was issued." While this provision of the statute is not controlling upon the question we are considering, it may be taken as an expression of public policy obtaining in similar situations. We are clear that the amendment of 1927 should not be construed as applying to drainage certificates already issued. This makes it unnecessary for us to consider whether the amendment is vulnerable as violating contractual obligations.

The county further complains because the court allowed to the drainage district the amount due on outstanding drainage certificates for the sale of 1921 upon which it is claimed that the statute of limitations had run prior to the institution of these proceedings. That this is a fact does not appear from the face of the record, neither does it ap-

pear that this question was raised in the court below. So far as we have been able to discover, this suggestion appears for the first time in the written exceptions filed by the county to the order for distribution. Under these circumstances the question is not properly before us. This disposes of all of the questions raised on the appeal of Portage County.

Upon the appeal of the Hanchett Bond Company the constitutionality of sec. 89.37 (4) (d) is also challenged, but for reasons not hereinbefore considered. This appellant finds fault with the provisions of said section because it provides that "from the moneys received from the sale of said lands the county treasurer shall first deduct any unpaid general taxes due the county." It perhaps should be stated that in Marathon and Wood counties the claims of said counties for general taxes were first paid out of the proceeds of the sale, which reduced the amount of money going to the drainage district for the payment of bonds. It is contended that the lien of the drainage assessments at all times was superior to the lien for general taxes, under the provisions of the drainage statutes.

This drainage district was organized in 1906. At that time the statutes (sec. 1379—22) provided that such assessments should be a lien on the land until paid. That continued to be the law until the passage of ch. 557, Laws of 1919, when said sec. 1379—22 was amended to read:

"Assessments for construction, additional assessments and assessments for repairs and interest thereon shall be a first lien upon the lands assessed from the time of recording the order of confirmation of the same in the office of the register of deeds of the county in which the lands are situated until paid, and shall take precedence over all other liens and mortgages, whether accruing prior to the time of the filing of the petition under the drainage district law or not, excepting only lien for general taxes."

Prior to the passage of ch. 557, Laws of 1919, the law

simply provided that such assessments should be a lien on the lands assessed. It was not in express terms made a lien prior to any other lien, not even a mortgage. There is not room even for discussion that under the original law the drainage assessment constituted a lien superior to the lien for general taxes. The law of 1919 makes it a first lien "over all other liens and mortgages, whether accruing prior to the time of the filing of the petition under the drainage district law or not, excepting only lien for general taxes." If this law has any application to the bonds of the drainage district, all of which, unless it be refunding bonds, were issued prior to 1919, it does not exalt the lien of the drainage assessments as a lien superior to the lien for general taxes. The drainage lien is a special assessment lien. There seems to be a conflict of authority as to the superiority of liens for general taxes and special assessments. In most instances it probably depends upon the statute. See note to Annotated Cases 1913 C, p. 1212. We shall not attempt to review the authorities bearing upon this question, because in our view the lien for general taxes is of a distinctly higher order than the lien of any special assessment, and we should not construe any statute as giving precedence to the lien of any special assessment over the lien of general taxes in the absence of a plain legislative command. The most that can be contended for the legislation of 1919 is that it made the lien of the special assessment and the lien of the general taxes co-equal. But even that contention is not plausible. In brief and abrupt language the amendment of 1919 made the drainage assessment a lien prior to all other liens excepting only liens for general taxes. The legislature was here dealing with priorities. It distinctly provided that the drainage assessment should not be a lien prior to the lien for general taxes. The plain inference is, and the proprieties as well as public policy dictates, that the drainage assessment is a lien subordinate

to the lien for general taxes. We concede that the provision of sec. 89.37 (5) that "No tax deed shall cut off any drainage assessment nor shall any drainage assessment deed cut off any tax" lends some force to the contention that it was the legislative purpose to make the liens co-equal, but in our view it amounts to nothing more than an ambiguity and does not constitute that plain legislative declaration which we consider necessary to subordinate the lien of general taxes. The provision of par. (d), therefore, that the unpaid general taxes shall first be deducted from the proceeds of the sale provided for by said section, does not constitute a taking of property for public use without just compensation therefor, nor does it impair the obligations of contract, as contended by the Hanchett Bond Company. Such a disposition of the proceeds is in exact consonance with the rights of the parties as fixed by the law prior to the enactment of said par. (d).

This appellant further attacks that provision of par. (d) which provides that "When lands shall have been finally sold under order of the court as provided herein, they shall be released from all lien of assessments levied prior to the time of such sale." It is contended that this provision takes property without just compensation and violates the obligations of contract. The argument of counsel in this behalf is not followed with ease, neither are the equities of his contention contemplated with patience. The history of this drainage district has given rise to many annoying problems owing to the fact that the project did not come up to the estimated benefits, resulting in a defalcation of the payment of the bonds. The legislature has from time to time enacted laws to enable the bondholders to realize upon their bonds, of which they have taken advantage, only later, in too many instances, to be challenged as unconstitutional. However, we realize that a constitutional right cannot be evaded by these considerations nor an argument upon a con-

stitutional question thus answered. The law has pledged as security for the payment of these bonds an amount equal to the assessed benefits. The statute which pledged these assessments as such security provided methods for their collection. They were to be collected as other taxes are collected. Those methods did not provide funds with which such bonds could be paid. The drainage assessments were not paid and the lands became delinquent. The taking of tax deeds, or drainage assessment deeds, the only alternative left, would not produce revenue by which the drainage district could discharge these bonds. In order to give the bondholders a remedy by which they might realize on their bonds, the legislature of 1923, by ch. 327, enacted par. (d) and provided for a sale of the lands from which might be realized moneys with which to pay general taxes and drainage assessments. Without some such provision the bondholders were unable to coerce payment, and in the meantime the statute of limitations was running upon the obligations. It is suggested that a court of equity could have provided a remedy, but, however that may be, the remedy could not have been more efficient than the simple, direct remedy provided by said par. (d), and it cannot be said that par. (d) deprived the bondholders of any remedy in the nature of a substantial right available to them prior to the enactment thereof. It was the purpose of this law to wipe out all assessments left prior to the time of the sale. Another way of stating this is to say that it was the purpose of the law to collect for the benefit of the bondholders all levies assessed prior to the sale. What is wrong with that provision? How does that interfere with the obligations of contract, or take private property without just compensation? The assessment of benefits marks the limit of the security of the bondholders. In this case an assessment equal to such benefits was imposed prior to the sale. It was imposed because the court was of the opinion that

it was necessary in order to secure bidders for the land, so that they could acquire title free and clear of any further drainage assessments. The Hanchett Bond Company acquiesced in that order: at least it did not appeal therefrom. Counsel indulges in some scolding about this order in the brief, but we do not understand that he attacks it. At any rate the attack comes too late if attack there be. There can be no question but that the order was made in the belief that it was for the benefit of the bondholders themselves and necessary in order to promote a favorable sale of the lands. We can see no reason why the bondholders have not by this sale realized upon all the security. All of the benefits have been assessed against their lands and the lands sold to realize the amount of such benefits. It seems plain that their security is exhausted and that they are deprived of nothing by the release of these lands from the lien of these assessments.

In a brief *amici curiæ* filed, the constitutionality of par. (d) is further challenged because of the lack of notice provided. That is a question not raised by any of the parties to the proceeding, neither could it be raised by any party before the court, because throughout the proceeding, from beginning to end, all possible requirements with reference to notice have been punctiliously complied with. However, let us analyze the paragraph and see what notice is necessary to satisfy the calls of due process of law, bearing in mind that this is a statute designed to facilitate the collection of delinquent taxes. It first provides that the circuit court may, upon the application of certain persons specified, direct the county treasurer to offer said lands for sale at public auction. The application giving rise to these proceedings was made by two holders of the bonds of the Dancy Drainage District. Notice of a hearing upon said application was given to all parties interested and a hearing was had, and before the order was made every one interested

consented to or at least acquiesced in the sale. Of course this hearing was not provided for by the statute. But is such a hearing with its attendant notices necessary to the end that the requirements of due process of law be not violated? We can see no reason why the law should not peremptorily provide that the lands described in par. (d) should be sold by the county treasurer just as the statute provides that there shall be a sale for delinquent taxes upon a specified day. Possessing this power, may not the legislature provide, so far as the requirements of due process of law are concerned, that the court shall direct such sale upon the petition of the parties interested, or that upon such a petition the court shall exercise a discretion and either direct or refuse to direct the sale, as it may think proper? It seems plain that neither hearing nor notice of hearing is necessary upon an application to the court to direct the sale provided for in said par. (d). That in which the property owners, the bondholders, and perhaps others, have an interest is the sale itself, and it seems to us that the notice of the sale provided for by the terms of said par. (d) is abundantly sufficient to satisfy the requirements of due process of law. When this sale is completed and report made to the circuit court, taxation proceedings are at an end, and the court takes charge of the fund under its supervisory control of the affairs of the drainage district. In his disposition of the proceeds of the sale occasions may arise when hearings are necessary or at least proper. When such occasions arise the court may order such hearings and provide for the giving of such notices as may be necessary to satisfy the requirements of due process of law, under its general powers. It is not essential to the validity of a provision like par. (d), the dominant purpose of which is to realize upon the security of special assessments, that it provide for notice in every conceivable situation that may arise, after such dominant purpose has been accomplished,

the sale completed, the money paid in, and title to the land passed to the purchaser at the sale. The only result that could attend failure to give notice with reference to such post-sale matters would be to invalidate the particular action of the court, and it should be the pride of all connected with the proceeding that no such a situation has arisen herein. We realize that the discussion of this particular question is to some extent volunteered, but a response to the contention made in this respect has seemed proper, and if it tends to clarify a doubtful situation it may serve a useful purpose. We have endeavored to cover all of the questions presented which seemed worthy of discussion. We think we may give assurance that no question has failed to receive consideration, even though it failed of mention herein. A conscientious consideration of the record reveals no reason for modifying or disturbing the order appealed from, and it will be affirmed.

*By the Court.*—So ordered.