STATE EX REL. MALOTT ET AL., RELATORS, *v.* BOARD OF COUNTY COMMISSIONERS OF CASCADE COUNTY ET AL., RESPONDENTS.

(No. 6,700.)

(Submitted June 12, 1930. Decided September 30, 1930. Opinion on Motion for Rehearing Filed January 23, 1931.)

[296 Pac. 1.]

38

*Messrs. Gunn, Rasch, Hall & Gunn,* for Relators, submitted an original reply and supplemental briefs; *Mr. M. S. Gunn* argued the cause orally.

44

46

*Mr. Frank P. Gault,* County Attorney for Cascade County, *Mr. Charles Davidson,* Assistant County Attorney, *Mr. Bert Packer,* County Attorney for Teton County, and *Messrs. Cooper, Stephenson & Hoover,* of Counsel, for Respondents, submitted an original and a supplemental brief; *Mr. Davidson* and *Mr. W. H. Hoover* argued the cause orally.

*Messrs. Gunn, Rasch, Hall & Gunn,* for Relators, presented written and oral argument, as did *Mr. W. H. Hoover,* of the firm of *Messrs. Cooper, Stephenson & Hoover,* and *Mr. Charles Davidson,* in behalf of Respondents.

*Messrs. Johnston, Coleman & Jameson,* in behalf of holders of bonds of the Box Elder and Lockwood Irrigation Districts.

*Messrs. Murphy & Whitlock,* representing holders of bonds of the Yellowstone Irrigation District.

*Mr. Sterling M. Wood,* representing the Western Agricultural Company, engaged in the colonization and development of lands in the Bynum Irrigation District.

*Mr. Henry V. Beeman,* appearing in behalf of bondholders interested in the Hammond Irrigation District.

*Mr. Fred J. Cunningham,* of the Bar of the State of Washington, for holders of bonds of the Big Horn-Tullock, the North Sanders and the Buffalo Rapids Irrigation Districts.

*Mr. C. N. Davidson,* Assistant Attorney General.

HONORABLE FRANK P. LEIPER, District Judge, sitting in place of MR. JUSTICE ANGSTMAN, disqualified, delivered the opinion of the court.

This is an original proceeding, wherein the relators seek a writ of mandate against the board of county commissioners of

Cascade County. An alternative writ issued. The respondents appeared by motion to quash and by answer.

The facts out of which this controversy grows may be briefly summarized: The Chestnut Valley irrigation district was organized under the provisions of Chapter 146 of the Session Laws of 1909, and Acts amendatory thereof. The lands included within that district are situated in Cascade county, Montana, and embrace about 4,549 acres. In July, 1920, this district duly issued bonds aggregating $140,000, bearing interest at six per cent per annum, payable semi-annually, and duly provided for the levy of a special tax or assessment on all of the lands within the district, sufficient in amount to pay the interest thereon, together with the principal of said bonds, as the same became due. The issuance of the bonds, together with the provision for the levy of a special tax or assessment, was duly approved by a judgment of the district court of Cascade county. The bonds were issued in denominations of $1,000 each, numbered from 1 to 140, inclusive, and all were sold. Fourteen of such bonds became due on January 1, 1926, and a like number on the first day of January of each successive year for nine years thereafter. The relators are the owners of 128 of these bonds, none of which have been paid, and there is interest accrued and unpaid in a sum in excess of $30,000, with no funds in the county treasury of that county for the payment of any part of either the principal or the interest. The commissioners of this district levied a tax or assessment against all of the lands within the district for the year 1920, and for each subsequent year up to and including the year 1927, for the payment of the principal and interest, but no levy for either principal or interest has been made since 1927. For several years preceding the year 1926 the taxes or assessments levied by the commissioners of this district for the payment of the principal and interest of these bonds, together with the state, county and school district taxes against said lands were not paid, except on about 600 acres of the lands included within the district. All of the lands upon which the general

taxes and assessments for irrigation district purposes were not paid were sold to the county of Cascade for irrigation district and general taxes. None of these lands have been redeemed. Time for redemption has expired, and tax deeds have issued therefor to Cascade county, and that county now holds the legal title thereto. More than one year has elapsed since these deeds were issued.

It is alleged that the respondent board has refused to sell these lands, or any thereof, or to offer them for sale. Respondents assert that, when these lands are sold, such sale will pass title thereto free and clear of the lien of these bonds, and free and clear of any further taxes or assessments for the payment of the principal or interest thereon; that, after Cascade county procured tax deeds to these lands, the respondents "proceeded with diligence to ascertain whether or not purchasers for said lands might be secured who would be willing to pay a reasonable, or any, price for said lands, and ascertained that, for the reason, among others, that the relators herein, and others, were asserting that such sale did not convey or pass a title free and clear of the lien of said bonds, purchasers could not be secured at prices satisfactory to respondents, or any prices, until such claims or asserted claims by the said bondholders should be determined; and with due diligence, after having secured said tax deeds, respondents heretofore, and upon the 5th day of April, 1920, filed in the district court * * * in and for the county of Cascade, an action * * * for the purpose of quieting the title of Cascade county to a portion of said lands. That Cascade county * * * is plaintiff in said action, and that the relators * * * are, among others, defendants in said action; that this action is now pending, and the relators have been duly served with process, and have appeared therein"; that, by this action, the county seeks to quiet the title to these lands "as against all adverse claims of any nature or description, including the claim of the relators that the title of the purchaser of said lands will be encumbered by the lien of said irrigation district bonds, or liable to any

future taxes or assessments for the payment of any part of the principal or interest on said bonds.''

Respondents assert further that, not until the action now pending in the district court of Cascade county ''has been brought to a termination will the title of Cascade county to said lands be of a sufficiently merchantable character to attract purchasers for the said lands; that, while the determination of the question presented by this proceeding in mandamus will dispose of the objection to said title commonly presented by prospective purchasers, the title adjudicated in Cascade county by said action to quiet title will be a more merchantable and acceptable title''; and that ''the failure of the board of county commissioners to sell said lands has not been a wrongful refusal on their part, but a practical market condition making said sale impossible until the determination of the question of title merchantability.''

Respondents assert that the relators have a plain, speedy and adequate remedy by interposing their defense in the action now pending in Cascade county.

It appears that there are many other similar irrigation districts within the state of Montana in which bonds have been issued and sold; that the assessments thereon for both principal and interest remain unpaid; that the general taxes are unpaid; that the lands included therein have been sold to the county in which such lands are situated; that the legal title thereto is now in such county; and that all of these lands have thus been removed from general taxation.

As above noted, the relators seek a writ of mandate commanding the board of county commissioners of Cascade county to sell all of these lands to which it holds the legal title at public auction for cash, after giving thirty days' notice, as provided by Chapter 162 of the Session Laws of 1929, and that such sale be made subject to the lien of these bonds, and to future taxes or assessments to be levied for the payment of the principal and interest thereon.

There are a number of questions presented for our determination, but all of these are incident to, and will be considered under, the following subdivisions:

(1) Are the provisions of either section 3 of Chapter 85, Laws of 1927, or Chapter 162, Laws of 1929, (a) violative of the provisions of section 10, Article I, of the federal Constitution or (b) in contravention of the provisions of either section 6, of Article XII, or section 39, of Article V of the Constitution of the state of Montana?

(2) When the lands included within the Chestnut Valley irrigation district are sold by Cascade county, will the purchaser, or purchasers, acquire title free and clear of the lien of these bonds?

(3) Should a writ of mandate issue commanding the respondent board to sell these lands?

Of these in their order.

1 (a). In the brief of counsel for the relators it.is said: "A law in force when the bonds were issued became a part of the contract with the bondholders, the same as though incorporated in the bonds." That this is a correct statement of the law may not be denied. This rule is based upon the provision of Article I, section 10, of the federal Constitution, which provides in part: "No state shall * * * pass any * * * law impairing the obligation of contracts."

In the case of *United States ex rel. Von Hoffman* v. *Quincy,* 4 Wall. 535, 550, 18 L. Ed. 403, the supreme court of the United States said: "It is also settled that the laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as if they were expressly referred to or incorporated in its terms. This principle embraces alike those which affect its validity, construction, discharge, and enforcement." In the same case it is further said: "It is competent for the states to change the form of the remedy, or to modify it otherwise, as they may see fit, provided no substantial right secured by the contract is thereby impaired. No attempt has been made to

fix definitely the line between alterations of the remedy, which are to be deemed legitimate, and those which, under the form of modifying the remedy, impair substantial rights. Every case must be determined upon its own circumstances.'' (See, also, *Louisiana* v. *New Orleans,* 102 U. S. 203, 26 L. Ed. 132; *Louisiana ex rel. Hubert* v. *New Orleans,* 215 U. S. 170, 54 L. Ed. 144, 30 Sup. Ct. Rep. 40; *Seibert* v. *United States,* 122 U. S. 284, 30 L. Ed. 1161, 7 Sup. Ct. Rep. 1190; *Moore* v. *Otis,* (C. C. A.) 275 Fed. 747; *Moore* v. *Gas Securities Co.,* (C. C. A.) 278 Fed. 111, 123; *Gibbons* v. *Hood River Irr. Dist.,* 66· Or. 208, 133 Pac. 772.)

Section 2 of Chapter 127, Laws of 1913, is carried forward into the Revised Codes of 1921 as section 7243. This section provides that, in the case where lands situated within an irrigation district are sold to the county for both irrigation district· and general taxes, then ''the county treasurer of such county must, upon the issuance of the certificate of tax sale to said county, issue to said irrigation district * * * a debenture certificate for the amount of taxes and assessments due to said irrigation district * * * inclusive of the interest and penalty thereon, which certificate shall be evidence of and conclusive of the interest and claim of said irrigation district * * * to * * * the lands and premises so struck off to said county * * * ; the sum named therein * * * shall bear interest at the rate of one per centum per month * * * until redeemed in the manner provided for by law for the redemption of the lands sold for delinquent state and county taxes, or until paid from the proceeds of the sale of the lands and premises described therein, in manner provided for by section 2235 of these Codes.''

Section 7246, Revised Codes of 1921 (sec. 2, Chap. 127, Laws of 1913) provides: ''When the lands and premises so sold for taxes, and upon and against which the certificates herein provided for have been issued for the taxes and assessments of such irrigation district, are not redeemed within the time provided for by section 2201 of these Codes, it shall be the duty of

the board of county commissioners of said county, within three months thereafter, to cause said lands and premises to be sold as provided for by section 2235 of these Codes, and out of the proceeds of the sale thereof the county treasurer of said county shall pay to the holder or holders of such certificates the sum or sums for which the same were issued, with interest as therein provided for to the date of said sale of said lands by the board of county commissioners, and no lands and premises so held by any county, and against which the certificates provided for by this title have been issued, shall, upon such sale, be struck off or sold for a less sum than the amount of taxes and assessments of said irrigation district represented by said certificates, inclusive of the interest thereon, in addition to the state and county taxes, if any, against the same."

Section 2682, Revised Codes 1907, as amended by Chapter 123, Laws of 1909, was amended by section 1, Chapter 18, Laws of 1919, and, as so amended, incorporated into the Revised Codes of 1921 as section 2235. Under it the board of county commissioners are empowered to sell real estate, which the county has acquired at tax sale for general taxes, at its reasonable market value, whether that price equals the amount of the delinquent taxes or not.

Section 2235 was amended by section 3, Chapter 85, Laws of 1927, and as so amended provides: "Whenever the county has become, or attempted to become, the purchaser of any property, real or personal, sold for delinquent taxes, and said property has not been redeemed by the person entitled to do so, and a tax deed or instrument purporting to convey title has been issued to the county, whether the same was regular or irregular, valid or invalid, the board of county commissioners may, at any time, by an order entered upon the minutes of its proceedings, sell such property at public auction at the front door of the courthouse; provided, however, that thirty (30) days notice of such sale shall be given by the board of county commissioners by publication in a newspaper printed in the county and by posting copies of such notice in at least five public places in the county; and provided further, that no sale of any

property shall be made for a price less than the fair market value thereof, as determined and fixed by the board of county commissioners at the time of making the order for sale, and which value shall be stated in the notice of sale.

"Such sale may be made for cash, or, in the case of real property, on such terms as the board of county commissioners may approve; provided, however, that if such sale is made on terms at least twenty per cent (20%) of the purchase price shall be paid in cash at the date of sale, and the remainder may be paid in installments extending over a period of not to exceed five years, and all of such deferred payments shall bear interest at the rate of 6% per annum. * * *

"The proceeds of every such sale shall be paid over to the county treasurer who shall apportion and distribute the same in the following manner:

"1. If such proceeds are in excess of the aggregate amount of all taxes and assessments accrued against such property for all funds and purposes, without penalty or interest, then so much of such proceeds shall be credited to each fund or purpose, as the same would have received had such taxes been paid before becoming delinquent, and all excess shall be credited to the general fund of the county.

"2. If such proceeds shall be less in amount than the aggregate amount of all taxes and assessments accrued against such property for all funds, and purposes, without penalty or interest, then such proceeds shall be prorated between such funds and purposes in the proportion that the amount of taxes and assessments accrued against such property for each such fund or purpose bears to the aggregate amount of taxes and assessments accrued against such property for all such funds and purposes."

Section 2235 was again amended by Chapter 162, Session Laws of 1929. By the amendment of 1929, the only changes made in section 2235, as amended by section 3, Chapter 85, of the Session Laws of 1927, are: (1) The words "of a value in excess of One Hundred Dollars ($100.00)" inserted after the word "personal" in the first paragraph of that amendment,

thus making the first four lines of the statute read: "Whenever the county has become or attempted to become, the purchaser of any property, real or personal, of a value in excess of One Hundred Dollars ($100.00)''; (2) by adding after the word "void" in the fifth paragraph the following: "If the property real or personal of which the county has become possessed, be of a value less than One Hundred Dollars, ($100.00), it will be sold in accordance with the provisions of Subdivision 10 of Section 4465 of the Revised Codes of Montana, 1921, and amendments thereto"; and (3) by omitting from the first paragraph the words, "provided further, that no sale of any property shall be made for a price less than the fair market value thereof, as determined and fixed by the board of county commissioners at the time of making the order for sale." That the clause last above mentioned and numbered (3) was intentionally omitted from the 1929 amendment is quite clear, because it is scarcely probable that an amendment would have been proposed solely for the purpose of inserting the somewhat inconsequential provisions as indicated in our numbers (1) and (2) above. But those are the only changes, except the omission noted in number (3) above. But it was clearly the intention of the legislature to make this omission, because the 1929 amendment had its inception in Senate Bill 105. That bill was enacted into law in precisely the same language as contained in it at the time of its introduction, with the exception of the addition of the words indicated in our numbers (1) and (2) above. The legislature thereby evinced its purpose to change the law so that the board of county commissioners might sell these lands at any price which was bidden therefor, at a public sale, held after notice given. In other words, under the provisions of the 1929 amendment, the board of commissioners may sell a quarter-section of land which is of the reasonable value of $5,000 for $1,000, if the latter sum is the highest amount bidden therefor.

The validity of an Act called in question is to be determined not only by what is certain to be done but what may be

done under it. (*State ex rel. Holliday* v. *O'Leary*, 43 Mont. 157, 115 Pac. 204; *State ex rel. Evans* v. *Stewart*, 53 Mont. 18, 161 Pac. 309; *State ex rel. Redman* v. *Meyers*, 65 Mont. 124, 210 Pac. 1064; *State* v. *Sunburst Refining Co.*, 73 Mont. 68, 235 Pac. 428; *Chicago etc. Ry. Co.* v. *Board of Railroad Commrs.*, 76 Mont. 305, 247 Pac. 162; *State ex rel. Brooks* v. *Cook*, 84 Mont. 478, 276 Pac. 958.)

The land within this irrigation district is included within the provisions of the 1929 amendment, for the language used is "*any property, real or personal,*" which may have been sold for delinquent taxes, and for which a tax deed has been taken. The law in force at the time of the sale of these bonds became a part of the contract. The legislature may change the remedy given the bondholders, but there must be substituted a remedy which is as efficacious as that contained in the law at the time of the issuance of the bonds. In the case of *Moore* v. *Gas Securities Co.*, supra, it is said: "Of course, the legislature was not without power to change the remedy, but in doing so it was obliged to give the bondholder some other equally adequate remedy, otherwise it would impair the obligation of his contract with the district."

At the time of the issuance of these bonds, the statute required that, upon the sale of these lands, the price obtained must be at least equal to the total of the assessments and general taxes, interest and costs. (Sec. 7246.) For the reasons hereinafter set forth, the provisions of section 7246 may be changed as to the price at which the land is sold without violating the obligations of the contract, provided that price is the reasonable market value of the land, but a change in the law which empowers the board of county commissioners to sell these lands at any price bidden therefor, regardless of whether the price is the reasonable market value of such lands or not, is so obviously violative of the obligations of the contract as that no further comment is required.

Included within the provisions of this Act are all lands, title to which is taken by the county through tax deed. We hold

that Chapter 162, Session Laws of 1929, is unconstitutional in so far as it applies to the disposition of lands located within an irrigation district and having outstanding unpaid bonds or debenture certificates, as here. As to this class of lands, the Act is unconstitutional. It is unconstitutional because the obligation of the contract with the bondholders is thereby impaired.

The question as to whether or not the Act is constitutional ▮ when applied to lands acquired by the county through tax deed other than those within the class above mentioned is not now before us, but, following the well-established rule of statutory construction, as to such we shall presume that it is constitutional.

"It will sometimes be found that an Act of the legislature ▮ is opposed in some of its provisions to the Constitution, while others, standing by themselves, would be unobjectionable. * * * In any such case the portion which conflicts with the Constitution, or in regard to which the necessary conditions have not been observed, must be treated as a nullity. Whether the other parts of the statute must also be adjudged void because of the association must depend upon a consideration of the object of the law, and in what manner and to what extent the unconstitutional portion affects the remainder. A statute, it has been said, is judicially held to be unconstitutional, because it may either propose to accomplish something prohibited by the Constitution, or to accomplish some lawful, and even laudable object, by means repugnant to the Constitution of the United States or of the state. * * * The point is not whether they are contained in the same section * * * but whether they are essentially and inseparably connected in substance. If, when the unconstitutional portion is stricken out, that which remains is complete in itself, and capable of being executed in accordance with the apparent legislative intent, wholly independent of that which was rejected, it must be sustained. The difficulty is in determining whether the bad parts of the statute are capable of being separated within the meaning of this rule. * * * But if its purpose is to ac-

complish a single object only, and some of its provisions are void, the whole must fall unless sufficient remains to effect the object without the aid of the invalid portion. And if they are so mutually connected with and dependent on each other, as conditions, considerations, or compensations for each other, as to warrant the belief that the legislature intended them as a whole, and if all could not be carried into effect, the legislature would not pass the residue independently, then if some parts are unconstitutional, all the provisions which are thus dependent, conditional, or connected must fall with them." (1 Cooley's Constitutional Limitations, 8th ed., pp. 359, 363. See, also, *State* v. *Duncan*, 265 Mo. 26, 175 S. W. 940, Ann. Cas. 1916D, 1, and note appended thereto.)

Section 2 of Chapter 162, Laws of 1929, provides: "All Acts and parts of Acts in conflict herewith are hereby repealed." The question then arises, What effect does this repealing clause have upon the provisions of section 3, Chapter 85, Laws of 1927? It is said in 25 R. C. L., section 166, page 913: "Where a repeal of a prior law is inserted in an Act in order to secure the unobstructed operation of the Act, and the repealing law is itself held to be void, the provisions for the repeal of the prior law will fall with it, and will not be operative in the repeal of the prior law, unless the language of the repealing clause is such as to leave no doubt as to its intention to repeal a former law, in any event. Where, however, it is not clear that the legislature, by a repealing clause attached to an unconstitutional Act, intended to repeal a former statute upon the same subject, except on the supposition that the new Act would take the place of the former one, the repealing clause falls with the Act of which it is a part. *A repealing clause in a statute of which a portion is unconstitutional is applicable only to laws inconsistent with the operative provisions of the Act.*" It is clear that it was the intention of the legislature in enacting Chapter 162 that it should be a substitute for section 3 of Chapter 85, Laws of 1927. There is no room for doubt but that it was the legislative purpose that the 1929 Act

would take the place of the 1927 Act; and equally clear that the repealing clause of the 1929 Act would not have been adopted had it not been that the new Act was a substitute for the old. In this situation the law is that the repealing Act fails, in so far as it relates to that part of the statute which is inoperative. It is said in the case of *People* v. *Mensching,* 187 N. Y. 8, 10 Ann. Cas. 101, 10 L. R. A. (n. s.) 625, 79 N. E. 884, 889: ''Even where there is a repealing clause in a statute, a portion of which is unconstitutional, such clause 'is applicable only to laws inconsistent with its operative provisions' ''—citing *Devoy* v. *Mayor etc. of New York,* 36 N. Y. 451. Continuing, the court says: ''We have recently decided the precise question in a case of public interest which received careful consideration.'' (*People* v. *Dooley,* 171 N. Y. 74, 63 N. E. 815.) In the last-cited case it is said: ''The repealing clause in the statute is applicable only to laws inconsistent with its operative provisions.'' We conclude, therefore, that the provisions of Chapter 162, in so far as the same relate to the lands within this irrigation district which have been transferred to the county through tax deed, and other lands similarly situated, are inoperative, and that the repealing clause of Chapter 162 does not in anywise affect the provisions of section 3, Chapter 85, of the Laws of 1927, in so far as the lands herein involved are concerned, or others in like situation.

Section 7246 by reference adopted, in part, section 2235. By reason of the provisions contained in section 3 of Chapter 85, Laws of 1927, relating to the division of the moneys derived from the sale of these lands, it is clear that it was the intention to include within the provisions of the Act the lands within an irrigation district. All doubt that such was the intention is removed by the further fact that section 4 of the 1927 Act provides: ''All Acts and parts of Acts in conflict herewith are hereby repealed; provided, however, that this Act is not intended, and nothing herein shall be deemed to be intended, either to repeal or displace Chapter 89 of the Laws of the Nineteenth Legislative Assembly of the State of Montana.''

Chapter 89 of the Laws of the Nineteenth Legislative Assembly (1925) deals exclusively with irrigation districts. It will be noted, then, that at the time of the sale of these bonds the law empowered the board of commissioners, in the event that title to the property was taken by the county through tax deed, to sell such property (a) within three months after the issuance of such deed; (b) such sale must be for cash; and (c) no sale could be made unless the price received was at least equal to the amount of all assessments and general taxes, together with interest and costs.

It will be noted further that under the 1927 amendment the board of county commissioners is empowered to sell (a) at any time, (b) either for cash or on terms, and (c) upon thirty days' notice the property may be sold at its fair market value as determined by the board of commissioners at the time of making the order of sale. It will be borne in mind that the state and the county, as well as the bondholders or the holders of the debenture certificates, have an interest in the land. By the enactment of section 7246, it was undoubtedly the purpose of the legislature to protect equally the rights of all parties interested in these lands. But the only means by which any funds could be obtained with which to pay all or any part of this indebtedness was through a sale of the lands. Under section 7246, before amendment, if the lands were offered for sale as provided by section 2235, and if a bid was made equaling or exceeding in amount the minimum fixed in section 7246, then a sale could be effected; but, if the bid made was for an amount less than the minimum, then a sale could not be made. In the meantime, the total of assessments and general taxes bear interest at one per cent per month, thus constantly increasing the amount of the indebtedness. Prior to the 1927 amendment, none of these lands could ever be sold, unless there was bidden therefor an amount equal to the assessments, taxes, interest and costs. An offer might have been made equaling the fair market value of the lands, yet that offer could not have been accepted, because less than the minimum fixed by the statute. If

the value of the land remained stationary, while the amount of the debt increased, obviously a sale could never be made. But, if a sale could not be made upon the basis of the reasonable value of the land because of the restrictions of the statute, then, instead of affording protection, the unfortunate parties—one of which is the sovereign—are left without any means whereby even a part of the indebtedness may be recovered. The legislature did not intend by enacting section 7246 to prevent a sale of these lands, but rather that a sale thereof should be made. But, in order to make a sale, there must be a purchaser. It is fair to assume that a purchaser could not be found who would be willing to pay more than the fair market value of· the land. By section 7246 it was intended that the price received should be the fair market value of the land sold, but in no case should the sale price be less than the minimum fixed. It was not intended that the lands must be sold at that minimum, unless that sum represented the fair market value. The 1927 amendment makes a sale possible, whether the sale price equals the minimum fixed by section 7246 or not, but the sale price, as fixed by the amendment, must be the fair market value of the land. But no sale ever could have been made for a greater amount than the fair market price. Therefore we hold that this change militates to the advantage, rather than to the disadvantage, of all concerned.

· As originally provided, the time in which the sale should be made was three months. Under the 1927 amendment it is "at any time." The time of effecting a sale is not necessarily retarded at all by this change in the law. Under the provisions of section 7246, before the 1927 amendment, it was the duty of the board of county commissioners, after the deed was taken, to proceed expeditiously to give the requisite notice and to make a sale of the land, if a bid or bids made therefor were sufficient to meet the requirements of the statute. If no such bids were received, no sale could be made. In other words, the board of commissioners might have used every reasonable means within its power to effect a sale within the three months, but,

because no bids were made equaling the minimum price fixed by the statute, have failed, and thus no sale would have been made within the time fixed by the statute. Certainly a sale might have been effected in much less time than three months, but there was no certainty that a sale would have been made within that time. Precisely the same result may be accomplished under the amendment within the same length of time. But the term "at any time" was not intended to be taken literally, else a sale could be made before the county acquired title, or it could be made in ten, or twenty, or fifty, or a hundred years. What is intended by that term is "a reasonable time," and what is a reasonable time is *"so much time as is necessary, under the circumstances, * * * what the * * * duty requires should be done in a particular case."* (*Henderson* v. *Daniels*, 62 Mont. 363, 205 Pac. 964, 967, citing *Bowen* v. *Detroit City Railway Co.*, 54 Mich. 496, 52 Am. Rep. 822, 20 N. W. 559.)

Before the 1927 amendment, the sale must be for cash. Under the provisions of the amendment, the sale may be either for cash or upon terms. If sold upon terms, then at least twenty per cent must be paid in cash, and the remainder of the purchase price in not to exceed five years, and all deferred payments shall bear interest at six per cent per annum. As above noted, it was the purpose of the legislature in the enactment of the law in force at the time of the issuance of these bonds to provide a means by which the holders of the debenture certificates would receive their due and the state and county their taxes. A provision is made for the division of the proceeds of the sale between these parties. It will be noted that the state and county are vitally interested in having a speedy sale of these lands, because, as matters now stand, the lands are not subject to assessment, and therefore are not bearing their fair share, or any share, of taxes. But when a sale is effected, these lands are again placed upon the assessment-rolls, and are subject to taxation. Again, the greater the price received the more likely that all interested will receive the

whole amount due. Any sale which results in increasing the price received for the lands is of equal advantage to all up to the point where all are paid in full. It does not necessarily follow that, by selling these lands upon terms, the time in which the interested parties will receive the money due them is retarded. A sale in which twenty per cent is paid in cash and the balance in five years, with interest, is much more to the advantage of those concerned than a sale of the same land for cash at the end of the five-year period. The advantage is obvious. Anyone at all familiar with economic conditions here must know that for some years past and at the present time a sale of land for cash is the exception, and that the only means by which a fair price may be obtained for land is its sale upon terms.

We must assume that the legislature had ample reason for making the changes in the statute, and that, in making them, it had in mind the consideration above mentioned, and others; that it had been found that the economic conditions of this state were such as to render impracticable, if not impossible, a sale of these lands, at a reasonable price, within the time then prescribed; that a sale upon terms would result in obtaining a better price, and therefore be to the advantage of all owning any interest therein; that in some instances a sale could not be made at all at a price equal to the amount of the general taxes, assessments, interest and other charges; and that, in order to afford the board of county commissioners a means of disposing of these lands at the best prices obtainable, and thus protecting the interests of all concerned, it enacted the amendment.

The relators cite the case of *Louisiana* v. *New Orleans*, 102 U. S. 203, 206, 26 L. Ed. 132, and quote therefrom as follows: "The obligation of a contract, in the constitutional sense, is the means provided by law by which it can be enforced, by which the parties can be obliged to perform it. Whatever legislation lessens the efficacy of these means impairs the obligation. If it tend to postpone or retard the enforcement of the

contract, the obligation of the latter is to that extent weakened. * * * Any authorization of the postponement of payment, or of means by which such postponement may be effected, is in conflict with the constitutional inhibition.''

But in the instant case the amended statute does not *postpone or retard* the sale of the land at all. It merely affords a means of making effective the provisions of the law which were in force at the time of the sale of the bonds. Before the enactment of these amendments, it was the duty of the board to act expeditiously in making a sale. That is its duty now. Under the statutes, before amendment, the board was not required to, neither ought it to, have waited three months to have made the sale, or one day, or one hour, if, after notice, a sale could have been effected in accordance with all of the provisions of the law. The same is true now.

In the case of *Moore* v. *Gas Securities Co.*, (C. C. A.) 278 Fed. 111, 122, cited in the brief of relators, the facts are: Bonds were issued by an irrigation district; a part of these was purchased by the plaintiff; the interest was not paid; at the time of the issuance and sale of the bonds, the law was that the assessments levied for the payment of the principal of and interest on the bonds should be collected as general taxes, and all must be paid or none; thereafter the law was amended, and the changes made are indicated in the court's opinion, a part of which is: ''These legislative Acts and the practice under them give the holders of bonds a different remedy for their collection from the one which they had at the time the bonds were issued. The material difference is this: formerly all taxes, state, county, school and district, had to be paid or none, now the taxpayer may let the district taxes become delinquent but pay all other taxes; formerly there was one tax sale for all delinquent taxes, now there may be two, one for district and one for all other taxes; formerly one tax sale certificate of purchase was issued for all delinquent taxes, now there may be two, and if to different persons, each is entitled to a deed on failure to redeem—and if each gets a deed, which has the title?

These changes, it seems to me, affect substantial rights of the bondholders. Their present remedy is not as adequate and efficient as was their prior remedy. The mode of procedure now adopted is a discrimination against district taxes by which they are put on a lower level than other taxes. Under the prior remedy there was compulsion on the taxpayer to pay all or none, and with it the patriotic impulse to promptly meet all just obligations to sustain schools, and state and county governments. Of course, the legislature was not without power to change the remedy, but in doing so it was obliged to give the bondholder some other equally adequate remedy, otherwise it would impair the obligation of his contract with the district. (*Von Hoffman* v. *Quincy,* 4 Wall. 535, 18 L. Ed. 403; *Walker* v. *Whitehead,* 16 Wall. 314, 21 L. Ed. 357; *Tennessee* v. *Sneed,* 96 U. S. 69, 24 L. Ed. 610; *Railroad* v. [*Louisiana ex. rel.*]; *New Orleans,* 157 U. S. 219, 39 L. Ed. 679, 15 Sup. Ct. Rep. 581; *Seibert* v. *Lewis,* 122 U. S. 284, 30 L. Ed. 1161, 7 Sup. Ct. Rep. 1190.)"

These cases, and others, but serve to illustrate the rule above mentioned that "each case must be determined upon its own circumstances."

1 (b). The respondents insist that the lands may not be sold for an amount less than the general taxes, else section 6 of Article XII, and section 39 of Article V, of the state Constitution, will be violated. These lands are not now subject to taxation, because owned by the county. If they may not be sold for an amount less than that represented by general taxes, then the very purpose of the Constitution and of the statutes is rendered ineffective by keeping this property from the tax rolls of the county, and thus, in effect exempting it from taxation. As is said in the case of *City of Beatrice* v. *Wright,* 72 Neb. 689, 101 N. W. 1039, 1043: "To say that such property cannot be sold for what it is worth in the markets, even though for a less sum than the assessments against it, is to defeat the very objects of taxation, and lead to results the Constitution itself sought to avoid. Unless the property can be sold for its

market value the result would be to exempt the property from all taxation for all time. This, of course, is an absurd result, and any construction leading thereto would be clearly inadmissible." To the same effect are *Fox* v. *Wright*, 152 Cal. 59, 91 Pac. 1005, and *Chapman* v. *Zoberlein*, 152 Cal. 216, 92 Pac. 188. The above decisions are based upon constitutional provisions substantially the same as that of our own, above mentioned.

Our conclusion as to this phase of the matter, therefore, is that section 3 of Chapter 85 of the Laws of 1927 affords the bondholders a means for the enforcement of their rights which is at least as adequate, if not more so, than those in force at the time of the issuance of the bonds, and that the provisions of the federal Constitution hereinbefore adverted to are not violated by section 3, Chapter 85, Laws of 1927; neither is the amendment in contravention of the provisions of our state Constitution hereinbefore mentioned.

2. At the outset it will be observed that section 7213 makes all bonds issued a lien upon all the lands in the district. "All bonds issued hereunder * * * shall be a lien upon all the lands originally or at any time included in the district for the irrigation and benefit of which said irrigation district was organized and said bonds were issued, * * * and all such lands shall be subject to a special tax or assessment for the payment of the interest on and principal of said bonds; * * * and said special tax or assessment, shall constitute a first and prior lien on the land against which levied, to the same extent and with like force and effect as taxes levied for state and county purposes."

The lien created by the annual assessment attaches only to the specific tract against which levied. Section 7235: "On or before the second Monday in July each year the board of commissioners of each irrigation district in this state shall ascertain the total amount required to be raised in that year for the general administrative expenses of the district, including costs of maintenance and repairs and interest on and the principal of the

outstanding bonded or other indebtedness of the district, including any indebtedness incurred under any contract between the district and the United States accompanying which bonds of the district have not been deposited with the United States, and shall levy against each forty-acre tract, or fractional forty-acre tract of land in the district (or where lands shall be owned and held in twenty-acre tracts or less, then against each such tract), that portion of the said amount so to be raised which the irrigable area of such tract bears to the total area of all of the irrigable lands in the district. But the tax thus determined by the irrigable area of each such tract shall become a lien upon the entire tract of land of which such irrigable area forms a part, and attaches thereto as of the first Monday of March of that year. * * * In the event that the ownership of any tract of land in the district shall be divided after any tax or assessment against the same has been levied, each or either of the owners of such divisions shall be entitled to have such tax or assessment equitably apportioned to and against such divisions, so that each such owner shall be enabled to pay such tax or assessment against his portion of such tract, and have the same discharged from the lien thereof.''

Thus there are two liens created. Is the lien created by section 7213 an encumbrance within the meaning of section 2215? Prior to its amendment in 1927, section 2215 provided: ''The deed conveys to the grantee the absolute title to the lands described therein, as of the date of the expiration of the period for redemption, free of *all encumbrances,* except the lien for taxes which may have attached subsequent to the sale, and except when the land is owned by the United States or this state, in which case it is prima facie evidence of the right of possession, accrued as of the date of the expiration of such period for redemption.''

Our section 2215 was enacted in 1891, and is an exact copy of section 3788 of the Political Code of California. Section 2215 was amended by section 2 of Chapter 85 of the Laws of 1927, and again amended by section 9 of Chapter 100, Laws

of 1929, but neither amendment changes the provisions of the statute in so far as irrigation district assessments are concerned. The last amendment excepted from the provisions of the statute local improvement assessments falling due after the execution of the tax deed, and applies only to certain assessments within special improvement districts in cities and towns. It is worthy of note that in making this amendment, although the legislature was dealing with special assessments of a certain kind, yet no exception is made of irrigation district assessments. It will also be noted that our irrigation district law is, generally speaking, patterned after the Wright Act of California (Stats. 1887, p. 29); that section 3788 of the California Code was in force at the time of the adoption of the Wright Act, and remained unchanged until 1917, when it was amended so that irrigation district assessments were brought within the exception of the statute. If any part of the Wright Act amended by implication the California section (3788), then why the amendment? Our legislature has not expressly amended section 2215. There is abundant evidence that the attention of our law-making body has been directed to the law affecting irrigation districts, for at each of its sessions, since the adoption of the Irrigation District Act in 1909, additional laws have been enacted either repealing or amending parts of the original Act or adding thereto, until we now have a veritable wilderness of laws upon this subject.

Relators insist that section 2215 is amended by implication. Repeal or amendment of a statute by implication is not favored. (*London Guaranty & Acc. Co.* v. *Industrial Accident Board*, 82 Mont. 304, 266 Pac. 1103; *State ex rel. Special Road District* v. *Millis*, 81 Mont. 86, 261 Pac. 885; *In re Naegele*, 70 Mont. 129, 224 Pac. 269.)

In a matter of such vital importance to the state, it would seem that, if the legislature had intended that irrigation district assessments should be excepted from the provisions of section 2215, it would have said so in that many words. Presumably, the lands included within irrigation districts are among

the most valuable within the state. These lands cannot be developed at all except for the protection afforded by the sovereign, nor without the advantages accruing because of the county and the school district. It is the right of the state to subject all property within its boundaries, not otherwise exempt, to taxation, and thus make it share the burdens of government, and it is also the right of the state that, when the property becomes burdened with taxes, to sell the property for its fair market value and thus place it back upon the tax rolls.

General taxes are considered superior to assessments, unless ▮▮▮▮ the contrary clearly appears by the statute. (*Ledegar* v. *Bockoven*, 77 Okl. 58, 185 Pac. 1097; *Dancy Drainage District* v. *Hanchett Bond Co.*, 199 Wis. 85, 225 N. W.. 873; *Bolton* v. *Terra Bella Irr. Dist.*, 106 Cal. App. 313, 289 Pac. 678; *Gould* v. *St. Paul*, 110 Minn. 324, 125 N. W. 273.)

In the case of *City of Tacoma* v. *Fletcher Realty Co.*, 146 Wash. 671, 264 Pac. 997, 999, it is said: "Unless it plainly appears from the legislative enactment that it was the intention of the state to sell the land subject to the lien of the local assessments, the court should not so hold." (*State ex rel. City of Great Falls* v. *Jeffries*, 83 Mont. 111, 270 Pac. 638, 640.)

Neither may it be said that, because the legislature failed expressly to declare that a lien for general taxes is superior and prior to all other liens, such general tax lien is subordinate to the lien for irrigation district assessments. It is aptly said in the case of *Minnesota* v. *Central Trust Co.*, (C. C. A.) 94 Fed. 244, 250, that: "It cannot be inferred that the lien for personal taxes * * * was intended to be subordinate to all prior private liens because the legislature failed to say that it should be deemed paramount. On the contrary, considering the character of the obligation and the dignity usually accorded to such liens, in public estimation, and above all, considering the necessity which exists for giving them priority in order that the public revenues may be promptly and faithfully collected, we conclude that the inference should be that the lien was intended by the legislature to be superior to all liens, prior or

subsequent, claimed by individuals, and that nothing should be allowed to overcome this inference but a plain expression of a different purpose found in the statute itself." (See, also, *Osterberg* v. *Union Trust Co.*, 93 U. S. 424, 23 L. Ed. 964; *Morey Engineering & Construction Co.* v. *St. Louis Artificial Ice Rink Co.*, 242 Mo. 241, Ann. Cas. 1913C, 1200; 40 L. R. A. (n. s.) 119, 146 S. W. 1142; *Dougherty* v. *Henarie*, 47 Cal. 9.)

While the people of Montana are greatly interested in whatever tends to the development of its arid lands by supplying water thereto, yet, in the enactment of the so-called irrigation district law, we must assume that the legislature had in mind the fact that an irrigation district is a creature of the sovereign —the state; that it is a part of the state; and that the continued existence of the state and municipal government is essential to the very life of the irrigation district. But, as is said in the case of *Mutual Benefit Life Ins. Co.* v. *Siefken*, 1 Neb. (Unof.) 860, 96 N. W. 603: "State and municipal governments cannot exist in the absence of revenue for their support. It is the duty of every person residing in a state and receiving the benefits of government to contribute his share towards its support. And every piece of real estate, as well as personal property, in the state, should contribute its share towards the support of the state, county, and municipality where situated. Anyone taking a mortgage, or securing a lien of any other character upon property, must take it with knowledge that such property is bound to pay its proportionate share of the taxes necessary to the maintenance of the government, and must understand that the obligation to contribute to the support of the government is something that attaches to the property itself."

In the case of *Buffalo Rapids Irr. Dist.* v. *Colleran*, 85 Mont. 466, 279 Pac. 369, 370, this court observed: "The ever-mounting expense of government requires vigilance on the part of government officers and agencies, to the end that all persons and all property receiving the benefit and protection of the government should contribute their just proportion of that expense to the end that the burden of taxation shall not become

unduly heavy upon those unable to escape its exactions; no small part of this vigilance should be exerted to prevent the broadening of exemptions beyond the contemplation of the framers of our Constitution.''

The taxes referred to in section 2215 mean those levied between the date of sale of the land and the time of the issuance of the tax deed.

When the legislature declared that the bonds issued by an irrigation district shall be a lien upon all the lands in the district (sec. 7213), we are justified in assuming that that branch of the state government did not overlook its former pronouncement contained in section 8219, wherein the word ''lien'' is defined as ''a charge imposed in some mode other than by a transfer in trust upon specific property, by which it is made security for the performance of an act''; and that it was likewise mindful of the provisions of section 6875, in which that body had theretofore declared that ''the term 'encumbrance' includes taxes, assessments, and all liens upon real property.'' It is elsewhere defined thus: ''An encumbrance is a burden or charge upon property; a claim or lien upon an estate which may diminish its value.'' (Webster's Dictionary.) ''A burden or claim upon property; a mortgage.'' (Century Dictionary.) ''Any right to * * * lands which may subsist in third persons to the diminution of the value of the estate.'' (2 Bouvier's Law Dictionary, 3d ed., 1530.) A charge is defined thus: ''A lien, encumbrance, or claim which is to be satisfied out of the specific thing, or proceeds thereof, to which it applies. A charge is not an interest in, but a lien upon land.'' (1 Bouvier's Law Dictionary, 459.) If by the provisions of section 7213 there is not placed a burden or charge upon the lands within the district at the time of the issuance of the bonds, then the language used therein is altogether meaningless.

California was the first of the western states to enact a law relating to the creation and operation of irrigation districts. Most of the other western states, including our own, have since

adopted legislation which, generally speaking, is patterned after the California Act. However, our Irrigation District Act differs in many particulars from either the Wright Act, or the Acts of any of the other states. Only a few of these differences are herein pointed out. None of these irrigation district Acts make the bonds of the irrigation district a lien upon the lands within the irrigation district, as does our section 7213. Neither do any of the other Acts have provisions similar to those contained in our sections 7210 and 7232, whereby it is made the duty of the board of commissioners of the irrigation district, in the order or resolution authorizing and directing the issuance of bonds of the district, to provide for the annual levy and collection of a special tax or assessment upon all the lands included in the district, sufficient to meet the interest on the bonds and to pay the principal thereof at maturity. Some other differences will be noted later herein.

Speaking of the title acquired through tax deed, this court in the case of *State ex rel. City of Great Falls* v. *Jeffries,* supra, has this to say: "However, 'the legislature has power to provide either that a tax sale shall create a new title, cutting off all prior liens, encumbrances, and interests, or to provide that the tax purchaser shall acquire the interest only of the person in whose name the land was assessed or of the real owner.' (3 Cooley on Taxation, 4th ed., 2930, sec. 1492.) By the enactment of section 2215, Revised Codes 1921, providing that a tax deed conveys absolute title 'free from all encumbrances, except the lien for taxes which may have attached subsequent to the sale,' our legislature adopted the first course. The tax deed mentioned is not derivative, but creates a new title in the nature of an independent grant from the sovereignty, extinguishing all former titles and liens not expressly exempted from its operation (*McQuity* v. *Doudna,* 101 Iowa, 144, 70 N. W. 99; *Clark* v. *Zaleski,* 253 Ill. 63, 97 N. E. 273; *Frederick* v. *Goodbee,* 120 La. 783, 45 South. 606), and irrespective of whether section 2215, above, impliedly makes the lien for general taxes paramount to that of special assessments

(*Woodill & Hulse Electric Co.* v. *Young*, 180 Cal. 667, 5 A. L. R. 1296, 182 Pac. 422), the tax deed extinguishes the lien of the assessment by its express terms, unless such assessments are included in the term 'taxes' as used in the section."

We therefore hold that, at the time of the issuance of these ▮▮▮ bonds, there was created a lien which constituted a charge or an encumbrance against the lands, within the meaning of that term as used in section 2215.

Neither is this holding in conflict with that of this court in the case of *Clark* v. *Demers*, 78 Mont. 287, 254 Pac. 162, 165 In that case the question presented was whether or not the charge resting upon all the lands of the district for the payment of the bonded indebtedness comes within the meaning of warranties against encumbrances contained in a deed, and the specific holding there was that this charge does "not constitute an encumbrance upon a tract of land in the district, *within the meaning of warranties against encumbrances contained in a deed,* except as to assessments levied and not paid prior to the making of the deed."

The decision of a court in any case should be read in the ▮▮▮ light of the precise question then under consideration. (*Cohens* v. *Virginia*, 6 Wheat. 264, 5 L. Ed. 257.) This court, speaking through Mr. Chief Justice Callaway, in the case of *State ex rel. Walker* v. *Jones*, 80 Mont. 574, 60 A. L. R. 551, 261 Pac. 356, 360, said: "It is a rule of universal application that general expressions used in a court's opinion are to be taken in connection with the case under consideration"—citing *Bramwell* v. *United States F. & G. Co.*, 269 U. S. 483, 70 L. Ed. 368, 46 Sup. Ct. Rep. 176. And again, in the case of *Sun River Stock & Land Co.* v. *Montana Trust & Savings Bank,* 81 Mont. 222, 262 Pac. 1039, 1047, this court said: "In considering the meaning and intent of the language of an opinion one must have constantly in mind the facts of the case in which the opinion is written. For, as Chief Justice Marshall observed, it is impossible so to use language as that general expressions apply in every instance with the same meaning to

every condition of facts''—citing *Chater* v. *San Francisco Sugar Refining Co.*, 19 Cal. 220.

One of the cases upon which the holding in the *Demers Case* is based is *Armstrong* v. *Trust Co.*, 96 Kan. 722, Ann. Cas. 1918D, 972, 153 Pac. 507, 508. In that case it is said: ''The courts have not hesitated to adopt 'the rule of reason' in construing *covenants against encumbrances,* and have often recognized a distinction between encumbrances which are such in a strictly literal exactness, and those which, from the nature of the contract, the situation of the parties, and their evident intent at the time it was made, appear not to have been in contemplation. * * * Every day contracts are made for the conveyance of real estate which is liable for future payment of assessments for special improvements already constructed. The assessments are payable in annual installments running usually in 10-year periods. These assessments constitute, in a strict sense, encumbrances on the land to the extent of the installments unpaid. The vendor, in the absence of any agreement, is liable of course for the payment of all overdue installments. He is also liable for the installment of the current year, provided the conveyance is made on or after November 1, because the maturing installment has ripened into a tax. But his covenant of warranty against encumbrances would not oblige him to rebate the purchase price to the extent of future installments. Those payable in the future, though strictly encumbrances on the land, are not such as diminish the value of the subject of the contract. The vendee who is to enjoy the benefit of the improvement during the remainder of the installment period ought to pay them, and therefore, though encumbrances in a strict sense, they are not so within the fair and reasonable construction of the covenant.''

It will be noted that the impositions placed upon the lands within an irrigation district are referred to in the statute as ''taxes'' and ''assessments.'' It is very important that the fundamental difference between these two terms be kept in mind. The distinction is aptly pointed out in 24 Cal.

Jur., section 22, pages 38 and 39, in the following language: "While the two terms (taxes and assessments) are sometimes used synonymously, there is a well recognized distinction between them. A tax is levied for the general public good, and without special regard to the benefit conferred upon the individual or property subject thereto, while a special assessment is levied to force payment for a benefit equal in value to the amount thereof. The latter (assessment) is not a tax of all the property within a district for general purposes, founded upon the benefits supposed to be derived from the organization of a government, but is a charge upon specific property for a specific purpose, founded upon the benefit supposed to be derived by the property itself. Whether a particular charge is one or the other is not governed by the designation thereof in the statute providing therefor, but by the nature of the imposition."

"But whether the term 'tax,' when used in a statute * * * includes an imposition for special improvements, must be determined by reference to the intention of the legislature, as that intention may be disclosed by the context, the purpose sought to be accomplished, the general scope of the Act and related Acts." (*Thomas* v. *City of Missoula*, 70 Mont. 478, 226 Pac. 213, 214.)

The impositions imposed upon the lands within an irrigation district for the purpose of irrigating the lands therein are special assessments. (*Walden* v. *Bitter Root Irr. Dist.*, 68 Mont. 281, 217 Pac. 646; *Thaanum* v. *Bynum Irr. Dist.*, 72 Mont. 221, 232 Pac. 528; *Clark v. Demers*, 78 Mont. 287, 254 Pac. 162; *Cosman* v. *Chestnut Valley Irr. Dist.*, 74 Mont. 111, 40 A. L. R. 1344, 238 Pac. 879, 881; Cooley on Taxation, 4th ed., sec. 1.)

We hold, therefore, that irrigation district assessments are not taxes, as that term is used in section 2215.

The only justification for these added impositions is the benefits accruing to the lands upon which the added burden is placed. (*Scilley* v. *Red Lodge-Rosebud Irr. Dist.*, 83 Mont.

282, 272 Pac. 543; *Cosman* v. *Chestnut Valley Irr. Dist.*, supra; *State ex rel. City of Great Falls* v. *Jeffries*, 83 Mont. 111, 270 Pac. 638; *Nelson* v. *Board of Commrs.*, 62 Utah, 218, 218 Pac. 952; *In re Harper Irr. Dist.*, 108 Or. 598, 216 Pac. 1020; *Union Trust Co.* v. *Carnhope Irr. Dist.*, 132 Wash. 538, 232 Pac. 341, 234 Pac. 277; *Power* v. *City of Helena*, 43 Mont. 336, 36 L. R. A. (n. s.) 39, 116 Pac. 415.) The theory upon which assessments may be levied for special improvements is "that the property assessed will be enhanced in value to the extent of the burden imposed." (*State ex rel. City of Great Falls* v. *Jeffries*, supra; *City of Butte* v. *School District No. 1*, 29 Mont. 336, 74 Pac. 869.)

If the sole justification for placing an additional burden upon a given tract of land is the benefits accruing to that tract of land, then it must follow that any exaction from the owner of that land of any amount substantially exceeding the value of such benefits is to that extent the taking of private property for an alleged public use without compensation. (*Norwood* v. *Baker*, 172 U. S. 269, 43 L. Ed. 443, 19 Sup. Ct. Rep 187.)

The rule is laid down in the *Cosman Case* that "an irrigation district is in the nature of a special improvement district, and, of course, has no authority to levy general taxes, its power in that regard being limited to what is known as special assessments. A special assessment is in the nature of a tax upon property levied according to benefits conferred on the property. (1 Cooley on Taxation, 105.) The justification and authority for levying special assessments is derived from the benefits which the expenditure of the tax or assessment confers on the owners of the lands in the special assessment district, and a tax out of all proportion to the benefits conferred could not be sustained." We reaffirm that rule.

The relators contend that, if these lands are sold free and clear of the lien of the bonds, then the law is violative of both the state and federal Constitutions, in that it amounts to the taking of private property for public use without just compensation. This because it is said that the whole burden for the

payment of the balance owing upon the bonds falls upon the remainder of the lands in the district, thus making the burdens greatly in excess of the benefits. If the remaining lands are liable for the payment of the whole amount of the remaining bonded indebtedness, then that conclusion is justified.

Relators contend again that these lands are liable, after sale by the county, to assessments, and that, in levying the future assessments, all delinquencies must be taken to account. Stated concretely, this contention amounts to this: That, if the general taxes against a given forty-acre tract of land amount to $100, and the assessments against the same tract amount to $400, and if upon the sale of that tract it brings $100, then the county would receive $20 to apply on taxes, and the irrigation district $80 to apply on delinquent assessments, and the remaining $320 would be added to the next assessment and spread in that assessment against all of the lands in the district. It is admitted that approximately 4,000 acres of the land in this district are delinquent, and tax deed has been taken by the county. Obviously, when the amount of the total delinquencies is spread, in the assessment, over all of the lands of the district, then, as to the lands upon which the taxes and assessments have been paid, they will have imposed upon them a burden out of all proportion to the benefits. "The validity of a statute is not determined by what has been done under it, but by what may be done under it." (*State ex rel. Holliday* v. *O'Leary*, 43 Mont. 157, 115 Pac. 204; *State ex rel. Redman* v. *Meyers*, 65 Mont. 124, 210 Pac. 1064; *Montana Co.* v. *St. Louis M. & M. Co.*, 152 U. S. 160, 38 L. Ed. 398, 14 Sup. Ct. Rep. 506, and cases supra.) If this construction be placed upon the statute, then it is unconstitutional, for the same reason as last above stated. The difference, if any, is one of amount or degree only.

It is an idle use of words to say that, if these lands are liable to future assessments, they may be sold, if at all, for more than a mere nominal price. These lands were offered for sale. There were no bidders, and therefore title was taken by the

county. As a practical matter, a purchaser, if he is desirous of acquiring a given piece of land, will first determine what, if any, encumbrance there is against it. If the encumbrance is found to be greater than the value of the land, an intelligent purchaser is not likely to proceed further. If the legislature intended that the obligation of these bonds should be a general one, then against each tract of land within this district there is an encumbrance of approximately $140,000, plus the unpaid interest thereon, in this case admittedly over $30,000, to which must be added interest at twelve per cent per annum through a long course of years, upon the delinquent assessments, and added to this the general taxes as well as the annual assessments for maintenance and repairs.

The holding in the *Cosman Case* to the effect that these bonds are general obligations of the district was based upon the assumption that, when the lands were sold, they would bring an amount equaling or exceeding the amount of the delinquencies. As hereinbefore noted, that law has since been amended, so that these lands may now be sold for their fair market value. We have noticed that this change in the law may be made without violating the obligation of the contract with the bondholders. As pointed out in the *Cosman Case*, if the lands upon which there are delinquencies are sold for an amount equaling the taxes and assessments, then the faithful assessment payer suffers nothing more than a temporary disadvantage. The holding in that case did not contemplate that a sale of the land might be made for an amount less than the delinquencies.

It is the duty of this court to construe a statute so that its constitutionality may be sustained, if that be possible. (25 R. C. L. 1000; *Panama R. R. Co.* v. *Johnson*, 264 U. S. 375, 68 L. Ed. 748, 44 Sup. Ct. Rep. 391; *State ex rel. Bonner* v. *Dixon*, 59 Mont. 58, 195 Pac. 841; *State ex rel. Northern Pac. Ry. Co.* v. *Duncan*, 68 Mont. 420, 219 Pac. 638.)

It is also the duty of a court to ascertain the intention of the legislature and to so construe the statute as to give it the effect of that intention. (*Sullivan* v. *City of Butte*, 65 Mont. 495,

211 Pac. 301; *Bennett* v. *Meeker,* 61 Mont. 307, 202 Pac. 203; *State* v. *Smith,* 57 Mont. 563, 190 Pac. 107.) But this intention of the legislature may not be ascertained from the wording of any particular section of a statute, but only from a consideration of the Act as a whole; the division of a statute into sections being merely a matter of convenience for the purpose of reference. (*In re Crow Creek Irr. Dist.,* 63 Mont. 293, 207 Pac. 121; *In re McLure's Estate,* 68 Mont. 556, 220 Pac. 527; *Mid-Northern Oil Co.* v. *Walker,* 65 Mont. 414, 211 Pac. 353.)

In construing a statute, where the language used is not clear, the court ought to consider the effect and consequences which will follow its determination. "In the construction of statutes, where the language is obscure or ambiguous, or for any reason its precise intent is not plain and cannot be made so by the context or other statutes *in pari materia,* the effects and consequences enter with more or less force into consideration. * * * A result which may follow from one construction or another of a statute is always a potent factor and is sometimes in and of itself conclusive as to the correct solution of the question as to its meaning. * * * Considerations of what is reasonable, convenient, or causes hardship and injustice have a potent influence in many cases. It is always assumed that ▓▓▓▓ the legislature aims to promote convenience, to enact only what is reasonable and just. Therefore, when any suggested construction necessarily involves a flagrant departure from this aim, it will not be adopted if any other is possible by which such pernicious consequences can be avoided. * * * In such a matter as the construction of a statute if the apparent logical construction of its language leads to results which it is impossible to believe that those who framed or those who passed the statute contemplated, and from which one's own judgment recoils, there is in my opinion good reason for believing that the construction which leads to such results cannot be the true construction of the statute. * * * A construction which must necessarily occasion great public and private mischief must never be preferred to a construction which will

occasion neither. * * * Statutes will be construed in the most beneficial way which their language will permit to prevent absurdity, hardship or injustice; to favor public convenience, and to oppose all prejudice to public interests." (2 Lewis' Sutherland on Statutory Construction, 2d ed., par. 487 et seq.)

We need not enter the field of speculation in order to visualize the consequences which will follow a construction of this statute sustaining the contentions of the relators. The admitted facts in this case reveal, at least in part, some of these.

Many of the decisions of other courts cited are not helpful in determining the matters submitted herein. This because upon investigation we find that in many instances the provisions of the statutes upon which such holdings are predicated are different from the provisions of our statute. The decisions of the supreme court of Washington in the cases of *State ex rel. Clancy* v. *Columbia Irr. Dist.*, 121 Wash. 79, 208 Pac. 27, and *State* v. *Hartung*, 150 Wash. 590, 274 Pac. 181, are cited by relators. Both of these cases hold that the bonds of irrigation districts are general obligations. But an examination of the Washington statute reveals that the law of that state contains the following provision relating to the levy of annual assessments: "The board shall also at the time of making the annual levy, estimate the amount of all probable delinquencies on said levy and shall thereupon levy a sufficient amount to cover the same and a further amount sufficient to cover any deficit that may have resulted from delinquent assessments for any preceding year." (Sec. 6437, Remington Code 1915, as amended by Session Laws of 1921, p. 448.) Our statute contains no such provision.

Relators rely upon the Oregon case of *Noble* v. *Yancey*, 116 Or. 356, 42 A. L. R. 1178, 241 Pac. 335, in support of the view that these bonds are general obligations of the district, but an examination of the Oregon law reveals that section 7326, Or. L., provides in part: "In case the amount assessed against any tract of land shall not be paid the next assessment against the

land in the district shall be so increased as to take care of such default. In addition to the provision for the payment of said bonds and interest by taxation and other provisions of this Act, all the property of the district, including irrigation and other works, shall be liable for the indebtedness of the district,'' and that section 7328 of the laws of that state provides: ''The board of directors shall, on or before the first Tuesday in September of each year, make a computation of the whole amount of money necessary to be raised by said district for the ensuing year, for any and all purposes whatsoever in carrying out the provisions of this Act including estimated delinquencies on assessments.'' No such provisions are to be found in our statute. It is true that the court in the same case holds that, regardless of the provisions last hereinabove quoted, the bonds constitute a general obligation of the district; but, in the light of all of the provisions of our statute, we cannot agree with that holding. It is fair to assume that there must have been some serious question as to whether or not, before the enactment of the above-quoted provisions, these bonds were general obligations of the district, because, after the adoption of the original Act in Oregon, these two last-named provisions were adopted as amendments.

In the case of *Nelson* v. *Board of Commrs. of Davis County*, 62 Utah, 218, 218 Pac. 952, the supreme court of Utah had before it the question, as stated in the opinion, and from which we quote as follows: ''The legal question presented is clearly stated in the brief of *amicus curiae* as follows: 'The question at issue in this proceeding is whether or not, under the Irrigation District Act of the state of Utah (Chap. 68, Laws Utah 1919, as amended by Chap. 73, Laws Utah 1921), a budget can be certified by the directors of an irrigation district, and a tax levied by a board of county commissioners in one year to include the delinquencies of a previous year. In other words, whether a cumulative levy can be made so that the property of one landowner can be made liable for its proportion of delinquencies arising from refusal of others to pay assessments

on their lands.' It will be controlling of this case to determine whether the bonded indebtedness of an irrigation district partakes of the nature of a general municipal indebtedness or is severable and partakes of the nature of an indebtedness for local improvements." The Utah statute authorized a levy of fifteen per cent to cover delinquencies. The court held that the bonds are not general obligations of the district, but that the indebtedness partakes of the nature of assessments for local improvements.

The supreme court of California, in the case of *San Diego* v. *Linda Vista Irr. Dist.*, 108 Cal. 189, 35 L. R. A. 33, 41 Pac. 291, 292, says: "But the assessment to satisfy which the lands in question were sold is not a tax, within the meaning of said provision of the constitution. The Act under which the Linda Vista District was organized authorizes the formation of districts where the lands of the different owners are 'susceptible of one mode of irrigation from a common source, and by the same system of works.' The district, when formed, is a local organization, to secure a local benefit, to be derived from the irrigation of lands from the same source of water supply, and by the same system of works. It is, therefore, a *charge* upon lands benefited * * * by a single local work or improvement, and from which the state, or the public at large, derives no direct benefit, but only that reflex benefit which all local improvements confer."

But it is argued that, since in a special improvement district within a city or town the entire cost is determined in advance, and that cost allocated against the several pieces of property within the district, and that in our irrigation district law this is not done, therefore it was the intention that the obligation should be general, as applied to an irrigation district. The distinction between the special improvement district created for the purpose of paving, for instance, and an irrigation district, is physical and not legal. In the case of a district created for the purpose of paving, the entire expense is susceptible of determination before the work commences, and, when the paving

is completed, all the expense has been incurred. In the case of an irrigation district, the assessments must be continuing ones, for, even after the bonds have been retired, assessments for maintenance and repairs must continue so long as irrigation within the district continues. As above noted, under the provisions of section 7232, in the resolution which the board is required to pass, the amount of the bonds is determined, the date of the maturity of each is fixed, the rate of interest is specified, and whether the interest is payable annually or semiannually is determined, and as well the exact times at which the payment thereof shall be made, together with the amount of each of such payments, but there must be added in the annual assessment the amount necessary to meet the charge for maintenance and repair, and that may not be definitely determined at the time of the issuance of the bonds for all of the years to come. Hence the provisions of section 7235. The amount necessary to meet the principal and interest of the bonds has been determined in advance. When a sum sufficient to meet the expense of maintenance and repair for a given year has been determined and added to the amount necessary to be raised for payment of principal and interest on the bonds, then what amount shall be levied against each forty-acre tract? That question is answered by the following provision of section 7235, to-wit: "and shall levy against each forty-acre tract, or fractional forty-acre tract of land in the district (or where lands shall be owned and held in twenty-acre tracts or less, then against each such tract), that portion of the said amount so to be raised which the irrigable area of such tract bears to the total area of all of the irrigable lands in the district." And section 7234 provides in part: "All lands in each irrigation district * * * shall pay at the same rate for all purposes for which said lands are charged."

In the case of *Interstate Trust Co.* v. *Montezuma Valley Irr. Dist.*, 66 Colo. 219, 181 Pac. 123, 124, the supreme court of Colorado had before it the question whether the irrigation district board was empowered, in making an assessment upon the

lands within the district, to include delinquencies. In that case it is said:

"Plaintiff contends, however, that irrigation district assessments, being levied annually throughout the life of the district, are for that reason inconsistent with the theory that the taxes are for local improvements. From a legal viewpoint this circumstance does not affect the character of the assessments. The difference between the assessments for the paving of streets and one for the irrigation of land is physical and not legal. In the first instance the result is accomplished and the benefit conferred when the paving is completed; in the second, in order to render the benefit a continuing one the assessments in the very nature of things must also be continuous. But this fact cannot be held to change that which is in fact a local improvement assessment into a general tax. * * *

"Irrigation district assessments are distinguished from taxes levied by a municipality for water works, and taxes levied for maintenance of schools because of the public nature of the latter. In the latter cases there is a direct public benefit, general in character, for which the public at large, through general taxes levied for that purpose, must pay. But in the construction and maintenance of an irrigation system there is obviously no direct general benefit. The direct advantage is to the particular land owner whose land is supplied with water, and he pays in proportion to the benefits received, the land itself being held for such payment."

What is said by this court in the *Buffalo Rapids Irr. Dist. Case,* supra, is pertinent here: "Further, while it is declared that irrigation districts are created to promote the welfare of the state, the state as a whole, the counties and school districts within which such districts may lie are benefited only incidentally, by reason of the increased valuations placed on the lands within the districts because of the special improvements made thereon and the increased prosperity of the owners of the land. The direct benefit accrues to the land improved and the owners thereof. (*Board of Directors of Pay-*

*ette Oregon Irr. Dist.* v. *Peterson* [64 Or. 46, 128 Pac. 837, 129 Pac. 123], above.) Irrigation districts are not created with a view to benefit the state or to organize a corporation for the discharge of governmental functions in addition to, or in aid of, the usual governmental departments or agencies, but in order to promote the material prosperity of the few owning property within their boundaries just as truly as are manufacturing plants established or mines and oil-wells developed. In so far as each of these projects brings into being new sources of revenue to the state, they promote the welfare of the state, but the mere production of additional values or property does not, in itself, warrant the exemption of the property from taxation, so long as that production is accomplished for private gain.''

It is urged by counsel for relators that these bonds should be considered as a highly favored form of security, because, it is asserted, they have been constituted legal investments for school and other trust funds. It is true that these bonds *may* become legal investments for trust funds, but only after a compliance with the provisions of sections 7216 to 7222, inclusive. But this fact is of no special significance, for, under the provisions of section 1928, the school funds of this state may be invested ''in first mortgages on good, improved farm land in the state of Montana.'' But, if a loan is made of the school funds upon farm lands, the lands are still subject to taxation, *and the state of Montana is obliged to protect its loan by the payment of the taxes levied against the land, or suffer the loss of its security through the taking of a tax deed.* The bondholders are in the same situation, and may protect their security by either paying the taxes or redeeming the land at any time prior to the expiration of the period for redemption.

Our statute contains no express provision authorizing delinquent assessments to be added to those subsequently made, as do the Washington and Oregon statutes. But it is asserted that such intention may be inferred from the general provisions of our statute, and particularly from those of section 7250 relating to transfer of lands within an irrigation district, implied

from the provisions of section 7232: "All bonds and the interest thereon issued hereunder * * * shall be and remain liable to be taxed and assessed for the payment of said bonds and interest"; and from the provisions of section 7244 relating to debenture certificates: "The lien of said irrigation district shall vest in the purchaser thereof, and is only divested by the payment to the purchaser or the county treasurer * * * for his use, of the sum for which said certificate is issued." But, as hereinbefore noted, in determining what is intended by any particular part of a statute, the whole must be considered together; and, after a most careful examination of all of the provisions of our statute, we think that these provisions were not intended to prevail when title is transferred by operation of law, as here. It was clearly the intention to make the annual assessment equal—not superior—to general taxes. But the tax lien is extinguished by tax deed. (Sec. 2152.) But, if the land is sold subject to future assessments for the payment of the principal of and interest on these bonds, then the lien created by section 7213 is superior to that of general taxes, for, whether the whole amount of taxes secured by the lien of the county has been paid or not, the same is extinguished, while that of the special assessments and debenture certificates continues to exist until paid, and may not be foreclosed. (*State ex rel. City of Great Falls* v. *Jeffries,* supra.)

The bonds are not an obligation of the district at all, but rather a charge against the lands within the district. The lien applies to the lands within the district. The district, in its capacity as a public corporation, merely acts as the agency through which the assessments are levied and collected. In 25 R. C. L. 172 it is said: "The levy and collection of assessments for local improvements is a purely statutory proceeding, and in derogation of the common law. It is a general rule that where a statute creates a new right, and prescribes a remedy therefor, the remedy is exclusive. This principle applies to statutes which gives the power to municipal or other public corporations to levy assessments for local improvements

and which provide for their collection. Hence it follows that no other liability can exist in respect to an assessment than that prescribed by a statute.''

We are satisfied that the rule heretofore announced by this court in the *Cosman Case* to the effect that bonds issued by an irrigation district constitute general obligations of that district is erroneous. We are further satisfied that less injury will result from overruling rather than following the doctrine as last above announced; and therefore the former holding of this court to the effect that such bonds constitute general obligations is overruled. It follows that the lien of the bonds is extinguished by the tax deed to the county, and that the purchaser from the county takes title free and clear of the lien of the bonds. Further, that the bonds are not general obligations of the irrigation district, but are a charge against the lands within the district, and that delinquent assessments for the payment of the bonds and interest may not be included in future assessments made against the other lands of the district. The lands remain liable, however, to assessment for maintenance and repairs.

It has been suggested by counsel for respondents that the county holds title to these lands as a trustee. While this matter is not directly before the court for determination, yet we observe in connection therewith that, when the county acquires these lands by tax deed on account of delinquent taxes and irrigation district assessments, it takes and holds such title as a trustee. The moneys derived from the sale of such lands are trust funds. The parties and entities interested in that fund are the school districts within the county, the county itself, the state to the extent of the taxes owing to it, the bondholders, and the holders of the debenture certificates. If the lands shall sell for an amount in excess of the taxes and assessments, then, after the payment of the general taxes, applying the well-established rules of equity, the remainder of the money should be turned over to the irrigation district, provided that sum does not exceed the total amount which would have been

assessed against these lands on account of the bonds, had such lands not been transferred by tax deed. Thus the bondholders will have received the full value of all of their security.

3. We now come to a consideration of the third question, Should a writ of mandate issue? Counsel for relators insist that under the rule announced by this court in the case of *State ex rel. Malott and Favre* v. *Board of County Commissioners of Fergus County*, 86 Mont. 595, 285 Pac. 932, a peremptory writ of mandate must issue herein. A careful analysis of the facts in that case and in this case, and a comparison of the facts in the former with those in the instant case, will disclose that a very different situation exists herein. The facts in the *Fergus County Case* are set forth in that opinion. In this case, about 4,000 acres of these lands within this irrigation district have been acquired by Cascade county through tax deed. From the facts disclosed it is fairly inferable that this total acreage was not in one block, but that there were a considerable number of separate units or farms. It is fair to presume that upon these farms there were buildings as are usual in such cases. Obviously, these lands could be sold by the county to better advantage in units than in one tract or block. The board of commissioners are required, as the first step looking to the sale of these lands, to make an order for the sale and, as a part of that order, fix the fair market value of the land to be sold. But, before the board could fix the fair market value of any of these farms, it became necessary to ascertain what kind of title the county could convey through that sale—whether that title would be subject to further assessments on account of these bonds or not. The respondents assert that these relators and others were asserting that the tax deed did not extinguish the lien of these bonds, and, because of this, the respondents were unable to sell these lands at their .fair market value or at any price. That the lien of the bonds was not extinguished by the tax deed is precisely what the relators are urging before this court. The respondents had taken steps

looking to the determination of this question because it appears that an action had been commenced in the district court of Cascade county, in which action the relators were made defendants and in which they had appeared—that the purpose of that action is to have a determination of this question made. In determining whether or not a peremptory writ of mandate must issue, we must take the facts as they were at the time of the commencement of these proceedings.

In this situation, even if the board of county commissioners had made an order of sale, fixed the fair market value of these lands, we think the conclusion is inescapable that no sale could likely have been effected. We must assume that these officers will perform their duty. Having in mind the unusual situation shown to exist herein and the multifarious circumstances surrounding the performance of the duty imposed upon the respondent board in the sale of these lands, we are constrained to conclude that the writ issued herein should not be made peremptory.

The question as to the lien of the bonds and as to whether the lands will be sold subject to future assessments on account of the bonds having been determined, it is now the duty of the respondent board to proceed to sell these lands without any unnecessary delay.

While discretion is lodged in the board of commissioners as to what is the fair market value of these lands, as to the time of selling them, and as to whether they shall be sold for cash or upon terms, yet this discretion must be exercised in such manner as that a sale of these lands will be effected within such reasonable time, at such price, and upon such terms, as will on the whole best serve the interests of all parties concerned.

The court heard the arguments in this cause on June 12, 1930, and, after consideration, handed down an opinion on September 30. A motion for rehearing was filed by relators, and distinguished counsel, other than those heretofore appearing herein, asked and obtained permission to appear as *amici curiae*.

Thereafter the court invited arguments upon the motion, and, on December 1, extensive and helpful arguments were presented to the court.

Each member of the court has labored earnestly to arrive at a correct result in the cause; hundreds of cases have been examined in addition to those cited in the briefs. A majority of the court agrees that the conclusion announced in the first opinion was correct. The opinion has been rewritten, covering the points treated in the first opinion and others; as the first opinion, therefore, will serve no purpose, it is withdrawn and this one substituted therefor.

The motion to quash the alternative writ is granted and the proceeding is dismissed, and the motion for rehearing is denied.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES MATTHEWS and FORD concur.

MR. JUSTICE GALEN: I dissent with respect to the second subdivision of the opinion, holding that the bonds do not constitute general obligations of the district. The statute requires that "*all the lands* in the district at the time said bonds are issued, and all lands subsequently included which are so chargeable under the provisions of this Act, *shall be and remain* liable to be taxed and assessed for the payment of said bonds and interest. * * * In the event that for any reason any special tax or assessment hereinabove provided for cannot or shall not be levied and collected in time to meet any interest falling due on any bonds issued hereunder, then the board of commissioners shall have the power and authority, and it shall be their duty, to provide for and pay such interest when due, either out of any of the funds in hand in the treasury of the district not otherwise appropriated, or by warrants (which may bear interest at a rate not to exceed six per centum per annum) drawn against the next district tax or assessment levied or to be levied." (Sec. 7232, Rev. Codes 1921.) The statute in itself is clear in the language employed, which unmistakably indicates a legislative intent that lands embraced in an irrigation dis-

trict are sequestered and held to meet the obligation of the bonds until fully discharged. (Secs. 7213, 7232, 7250, 7251, Rev. Codes 1921. And such has heretofore been the holding of this court, in line with the decisions of other courts construing like statutes. The case of *Cosman* v. *Chestnut Valley Irr. Dist.*, 74 Mont. 111, 40 A. L. R. 1344, 238 Pac. 879, involving the identical bonds now under consideration, was decided July 14, 1925, more than five years ago, and, if not *res adjudicata*, should be reaffirmed on the doctrine of *stare decisis*. It is difficult to estimate to what extent bonds have been sold and money parted with on the strength of such decision. Furthermore, it must be remembered that on the only other occasions when this court was called upon to pass on the question the holding in the *Cosman Case* was reaffirmed. (*Clark* v. *Demers*, 78 Mont. 287, 254 Pac. 162; *Drake* v. *Schoregge*, 85 Mont. 94, 277 Pac. 627, 631.)

This court, in the case of *Cosman* v. *Chestnut Valley Irr. Dist.*, supra, decided that the very bonds involved in this case are general obligations of the Chestnut Valley irrigation district. The plaintiff, a land owner within the district, sought to enjoin the commissioners of the district from including in the levy for the payment of interest on the bonds any amount on account of delinquencies in the payment of the taxes or assessments against other land owners. In the opinion this court said:

"Do the bonds of an irrigation district create a general obligation against the district in the sense that all the lands within the district are taxable for the payment of the said bonds and interest until the entire indebtedness is paid?

"Plaintiff contends * * * that since the tax is a special assessment, it therefore follows that each landowner within the district is taxable for the payment of only such proportion of the bonded indebtedness as his land bears to the entire irrigable area within the district and that when such proportional payment is made his lands are fully and finally released from any further lien of the bonded indebtedness."

The court then, after quoting from the irrigation district law of Montana, further said:

"It will be noted from the foregoing that it is reiterated in the several sections of the Act that payment of bonds is secured by a lien upon all the lands in the district, and that the duty is enjoined upon the commissioners to levy an annual tax or assessment sufficient in amount to meet the interest on said bonds promptly, and to discharge the principal at maturity. Now, the commissioners, if they are to make a levy sufficient in amount to meet the maturing obligations of said bonds, must of necessity take into consideration the delinquencies which inevitably occur in every system of taxation; hence the levy must always be for an amount somewhat larger than the payments which the law says must be made, the necessary margin depending upon an estimate of the amount of the delinquencies. (*Hughson* v. *Crane*, 115 Cal. 404, 47 Pac. 120.) But it will be noted from the provisions of section 7232 that if from any reason any assessment cannot or shall not be collected in time to meet any interest payments falling due, it is the duty of the commissioners to pay the interest out of any funds in the treasury of the district not otherwise appropriated or by interest-bearing warrants drawn against the next district tax or assessment.

"The foregoing and other provisions of the statute clearly indicate an intention that the bonded indebtedness shall be a charge against all the lands in the district, and that all the lands in the district shall be taxed pro rata by irrigable acreage until the bonded indebtedness is fully discharged, regardless of delinquencies. That this is a correct interpretation of the legislative intent is fully confirmed when we recall that in 1917 an amendment was added to section 7213, which provided, in substance, that the lien of the bond issue should be specifically apportioned to each 40-acre tract, and each parcel of land separately owned, and that on the payment of the assessment levied against any particular tract or parcel of land, 'thereupon said tract or tracts of land so paid upon in full shall be discharged

from the lien of said bonds and further assessments or interest thereon.' (Sec. 8, Chap. 153, Laws of the Fifteenth Legislative Assembly.) As thus amended, the statute clearly provided in specific terms the very thing which plaintiff now contends is in the law; but in 1919 the legislature saw fit to repeal the amendment of 1917 so that as it now stands, and as it stood prior to the enactment of the amendment, it contains no provision whereby a land owner can, by paying his *pro rata* share of the assessment for his lands, be released from the lien of the bonded indebtedness, as is the case with drainage districts and city improvement districts. (Sec. 6, Chap. 116, Laws of the Sixteenth Legislative Assembly.) By repealing the amendment of 1917, the legislature showed clearly its intention that no lands be released from the lien until the bonded indebtedness is discharged in full.''

In that case we held, correctly, that the provisions of the statute ''clearly indicate an intention that the bonded indebtedness shall be a charge against all the lands in the district, and that all the lands in the district shall be taxed *pro rata* by irrigable acreage until the bonded indebtedness is fully discharged, regardless of delinquencies.'' And the rule with reference to the effect of such a decision is aptly stated in 34 C. J., page 1028, as follows: ''In the absence of fraud or collusion, a judgment for or against a municipal corporation, county, town, school or *irrigation district,* or other local governmental agency or district, or a board or officers properly representing it, is binding and conclusive on all residents, citizens, and taxpayers in respect to matters adjudicated which are of general and public interest, such as questions relating to public property, contracts, or other obligations. The rule is frequently applied to judgments rendered in an action between certain residents or taxpayers and a municipality, county or district, or board or officer representing it, it being held that all other citizens and taxpayers similarly situated are represented in the litigation and bound by the judgment, in the absence of fraud or collusion.''

In *Clark* v. *Demers* we said: "The bond issue is a general obligation resting upon all lands within the district," reaffirming the holding in the *Cosman Case;* and in the later case of *Drake* v. *Schoregge* we held that the "bonds issued create a general indebtedness against the district, in the sense that all lands therein are taxable for the payment thereof with interest, until the entire indebtedness is fully paid"—citing the *Cosman Case* and again reaffirming it.

In 15 Corpus Juris, 916, it is said: "It is a well established general rule that, where a principle of law has become settled by a series of decisions, it is binding on the courts and should be followed. This rule, which is usually known and referred to as the rule of *stare decisis,* is founded largely upon considerations of expediency and sound principles of public policy, it being indispensable to the due administration of justice, especially by a court of last resort, that a question once deliberately examined and decided should be considered as settled and closed to further argument; and the courts are slow to interfere with the principle announced by the decision, and it may be upheld, even though they would decide otherwise were the question a new one."

In the case of *Fisher* v. *Horicon etc. Mfg. Co.,* 10 Wis. 351, the court said: "It is the duty of this branch of the government to pass finally upon the construction of a law, and determine whether the legislature in its action has transcended its constitutional limits, and the community has a right to expect, with confidence, we will adhere to decisions made after full argument and upon due consideration. The members of the court may change totally every six years, and if each change in the organization produces a change in the decisions, and a different construction of laws, under which important rights and interests have become vested, it is easy to see that the consequences will be most pernicious."

An examination of the authorities discloses the fact that our conclusion reached in the *Cosman Case,* that the bonds constitute a general obligation against all of the lands embraced in

the district, is the view generally expressed by the courts which have had occasion to construe and apply like statutory provisions. In the case of *Rialto Irr. Dist.* v. *Stowell*, 246 Fed. 294, 305, the circuit court of appeals of this (the ninth) circuit, in construing like provisions of the irrigation district laws of California, known as the "Wright Act" (October 15, 1917), said: "We regard it as clear that the bonds here in question constitute a general obligation of the irrigation district to pay the principal and interest thereof as therein provided for."

A late decision upon the subject (December 2, 1925) is that of *Noble* v. *Yancey*, 116 Or. 356, 42 A. L. R. 1178, 241 Pac. 335, wherein Mr. Justice Bean, speaking for the supreme court of Oregon, reviews the authorities, and declares such bonds to be general obligations of the district. Among other cases to like effect are: *State ex rel. Clancy* v. *Columbia Irr. Dist.*, 121 Wash. 79, 208 Pac. 27; *State* v. *Hartung*, 150 Wash. 590, 274 Pac. 181; *American Falls Reservoir District* v. *Thrall*, 39 Idaho, 105, 228 Pac. 236, 243; *In re Lovelock Irr. Dist.*, 51 Nev. 215, 273 Pac. 983.

In the case of *American Falls Reservoir Dist.* v. *Thrall*, supra, the supreme court of Idaho well said, by way of differentiation: "It will be noted that there is a wide difference between the method pointed out by the statute for the payment of special district improvement bonds such as paving, sewer, sidewalk, and the like, wherein the amount of such bonds is specifically segregated and apportioned to each separate subdivision, and the owner of any land within such district has the option to pay the entire assessment against his property and upon doing so to have it released from further liability under such bond issue. No similar provision is found in the irrigation district law, but on the contrary it is expressly provided that 'all the land in the district *shall be and remain liable* to be assessed for such payment.' " It is clear to me that all of the lands in the district are held in common to meet and pay the obligation of the bonds as much as are the lands of a county or of a school district to meet like character of indebt-

edness. An irrigation district is declared to be a public corporation. (Sec. 7169.)

In the case of *Fallbrook Irr. Dist.* v. *Bradley*, 164 U. S. 112, 41 L. Ed. 369, 17 Sup. Ct. Rep. 56, 65, in which the constitutionality of the Wright Law of California was determined, the court said: "Statutes authorizing drainage of swamp lands have frequently been upheld independently of any effect upon the public health, as reasonable regulations for the general advantage of those who are treated for this purpose as owners of a common property. (*Head* v. *Amoskeag Manufacturing Co.*, 113 U. S. 9, 22, 5 S. Ct. 441, 446 [28 L. Ed. 889]; *Wurts* v. *Hoagland*, 114 U. S. 606, 611, 5 S. Ct. 1086, 1089 [29 L. Ed. 229]; Cooley, Tax'n (2d Ed.), p. 617.) If it be essential or material for the prosperity of the community, and if the improvement be one in which all the landowners have to a certain extent a common interest, and the improvement cannot be accomplished without the concurrence of all or nearly all of such owners by reason of the peculiar natural condition of the tract sought to be reclaimed, then such reclamation may be made, and the land rendered useful to all, and at their joint expense. In such case the absolute right of each individual owner of land must yield to a certain extent, or be modified by corresponding rights on the part of other owners for what is declared upon the whole to be for the public benefit."

By reason of the fact that the land owners are treated as "owners of a common property," and the irrigation of their lands may be accomplished at their "joint expense," the bonds should be and are regarded as general obligations against all the lands in the district. In other words, so far as the creation of an indebtedness for the irrigation of the lands and the benefits which will accrue from such benefits are concerned, all of the lands are treated as a single tract in which the owners are tenants in common. I therefore submit that the *Fallbrook Case* is of itself an authority supporting the conclusion that the bonds are general obligations. As a matter of contract, the

bonds themselves indicate on their face that they constitute general obligations of the district, one of which appears in the petition and reads in part as follows: "The Chestnut Valley Irrigation District, a public corporation of the state of Montana, organized and existing under the laws of the state of Montana, for value received, promises to pay the bearer the sum of One Thousand Dollars," etc.

Section 7211, Revised Codes 1921, relating to the issuance of the bonds, provides: "The board of commissioners shall file a petition in the district court of the judicial district wherein is located the office of said board, to determine the validity of the proceedings had relative to the issuance of said bonds, and to the levy of said special tax or assessment. * * * Upon the hearing the district court * * * shall have power and jurisdiction to examine and determine the regularity, legality, and validity of the proceedings had preliminary and relative to the issuance of the bonds, and the levy of the special tax or assessment in the petition mentioned, and the legality and validity of said bonds, and special tax or assessment. * * * The court may ratify, approve, and confirm said proceedings in whole or in part, and may ratify, approve, and confirm said bonds and special tax or assessment, and enter its judgment or decree accordingly." Provision is then made for appeal from the judgment, and "if no such appeal be taken * * * or if taken and the judgment or decree of the district court be affirmed by the supreme court, such judgment or decree shall be forever conclusive upon all the world as to the validity of said bonds and said special tax or assessment, and the same shall never be called into question in any court in the state."

Here it appears from the admitted facts that prior to July 1, 1920, the date of the issuance of the bonds, the district court by its "judgment duly given, made and entered, ratified, approved and confirmed said bonds, the proceedings of said Board of Commissioners authorizing the issuance thereof, and said special tax or assessment, from which judgment or decree no appeal was taken to the supreme court of the state."

Thus the validity of the bonds is decreed, and authority to levy an annual tax or assessment upon the lands in the district until the bonds and interest are fully paid is confirmed by a judgment which is declared to be "conclusive upon all the world," never to be "called into question in any court in this state." No condition is attached to such levy and no limitation of time is prescribed, *except the payment of the bonds in full*. In view of these considerations, I ask, is not the question of the liability of the lands for future taxes or assessments to pay the principal and interest of the bonds absolutely foreclosed by the judgment?

Further, indicative of the substantial character of the general obligations and adequacy of the security, as viewed by the lawmakers, it is provided: "All bonds certified in accordance with the terms of this Act shall be legal investments for all trust funds, and for the funds of all insurance companies, banks, both commercial and savings, and trust companies, and for the state school funds, and whenever any money or funds may, by law now or hereafter enacted, be invested in bonds of cities, cities and counties, counties, school districts, or municipalities in the state of Montana, such money or funds may be invested in the said bonds of irrigation districts, and whenever bonds of cities, cities and counties, counties, school districts, or municipalities may, by any law now or hereafter enacted, be used as security for the performance of any act, bonds of irrigation districts under the limitations in this Act provided may be so used." (Sec. 7225, Rev. Codes 1921.)

The declaration made by the statute that the bonds constitute a lien upon all the lands in the district and the further declaration that all of the lands shall be and remain liable to be taxed and assessed for the payment of the bonds and interest and the requirement of an annual levy upon all the lands sufficient in amount to pay the interest and principal of the bonds promptly, can have no other meaning than that the bonds are general obligations. If, however, there could be any doubt, that doubt is removed by the provision requiring the issuance

of warrants against the next district tax or assessment levied or to be levied, for unpaid interest because of the failure to collect the taxes or assessments levied to pay the same. In other words, the law thus expressly requires a levy against the lands.

The requirement of the law that all of the lands of the district "shall be and remain liable to be taxed and assessed for the payment of said bonds and interest," with the provision requiring the annual levy of a tax or assessment upon all the lands included in the district sufficient in amount to pay the principal and interest of the bonds promptly, should be sufficient evidence of intention on the part of the lawmakers that the lands conveyed by tax deed are still subject to taxation for the payment of the principal and interest of the bonds. However, apparently, in order to remove all possible doubt, it is provided by section 7250 that "where any lands in any district are sold or transferred either by deed, mortgage, foreclosure sale, *or otherwise* such sale or transfer shall include the water belonging to and appurtenant to the land, whether or not the same is expressly stated in the deed, instrument or transfer, or decree, and such land shall be liable to special tax or assessment the same as if such sale or transfer had not been made."

It is suggested in the majority opinion that, if the bonds are general obligations, and the lands conveyed by tax deed to the county do not sell for sufficient to pay the irrigation district taxes or assessments levied for the payment of the principal and interest on the bonds, the effect would be to impose upon the land owners who have paid their taxes or assessments a tax in excess of benefits. This may be true, but, as said in the *Cosman Case:* "In the very nature of things delinquencies will occur in any scheme of taxation, and the power to make levies sufficient to meet these delinquencies is a necessary incident to the power to impose a tax or assessment." The same argument against making the bonds general obligations was advanced in the case of *Norris* v. *Montezuma Valley Irr. Dist.,*

(C. C. A.) 248 Fed. 369, in which it was held that the bonds are general obligations. And it is worthy of note that application made to the supreme court of the United States for a writ of certiorari to review the decision was denied. (248 U. S. 569, 63 L. Ed. 425, 39 Sup. Ct. Rep. 10.) And it may be presumed that, if the supreme court of the United States had not considered the case correctly decided, the writ would have issued.

The correct rule of statutory construction, as stated by Professor Sutherland in his work on Statutory Construction, second edition, volume 2, paragraph 487, is as follows: "A result which may follow from one construction or another of a statute is always a potent factor and is sometimes in and of itself conclusive as to the correct solution of the question as to its meaning. * * * Considerations of what is reasonable, convenient, or causes hardship and injustice have a potent influence in many cases. It is always assumed that the legislature aims to promote convenience, to enact only what is reasonable and just. Therefore, when any suggested construction necessarily involves a flagrant departure from this aim, it will not be adopted if any other is possible by which such pernicious consequences can be avoided. * * * In such a matter as the construction of a statute if the apparent logical construction of its language leads to results which it is impossible to believe that those who framed or those who passed the statute contemplated, and from which one's own judgment recoils, there is in my opinion good reason for believing that the construction which leads to such results cannot be the true construction of the statute. * * * A construction which must necessarily occasion great public and private mischief must never be preferred to a construction which will occasion neither. * * * Statutes will be construed in the most beneficial way which their language will permit to prevent absurdity, hardship or injustice; to favor public convenience, and to oppose all prejudice to public interests."

The decision in this case is of far-reaching importance, and is calculated to materially affect the faith and credit of the state in future business. When, as here, the sovereignty of the state has made enactment calculated to interest and protect investors, they should, if possible, be given the full protection intended by the statutes without destruction or impairment of the security, thus upholding and maintaining the state's integrity. (*State ex rel. Malott* v. *Board of County Commrs.*, 86 Mont. 595, 285 Pac. 932.) To my mind, the statutes are consistent and in harmony, and lead to but one conclusion and that is, that it was the intent from the beginning that all the lands in the district should be held and remain liable for the payment of the indebtedness, with interest and the cost of maintenance, until the bonds are fully paid. The doctrine of the *Cosman Case* is a correct statement of the law and should not be disturbed.