[Civ. No. 5742. Third Appellate District.—February 7, 1939.]

MARY E. MORRIS, Petitioner, v. CALIFORNIA GIBSON, as County Treasurer, etc., Respondent; RECLAMATION DISTRICT No. 108 et al., Interveners; FREDERICK F. COOPER et al., Interveners.

Clark, Nichols & Eltse for Petitioner.

Ralph W. Rutledge and Arthur C. Huston for Respondent.

Athearn, Chandler & Farmer, Milton T. Farmer and Edward G. Chandler for Interveners Cooper et al.

Thomas Rutledge, A. C. Huston and Horace B. Wulff for Interveners Reclamation District No. 108 et al.

PULLEN, P. J.—This case was taken over upon a petition for rehearing. In a former opinion (Cal. App.) 65 Pac. (2d) 956, a writ of mandate was issued directing California Gibson, as treasurer of Colusa County, to make certain payments upon bonds issued by Reclamation District No. 108, and secured by assessment No. 5 of that district.

In that opinion the conclusion was reached that the district was insolvent and could not pay its obligations as they accrued, and the treasurer was directed to distribute to all bondholders and claimants of the district, proratedly rather than in order of maturity, a sum of approximately $141,000 which had accrued to the district as rentals and proceeds from 1935 and 1936 crops from lands that had passed into the ownership of the district.

The petition for rehearing was granted for the purpose primarily of having an accounting in order that it might be determined definitely whether the bond fund of the district was or was not insolvent. Such an accounting was had; the report of the accountant and referee has been filed; the cause has been fully argued, supplemental briefs filed, and the matter is again ready for consideration.

Two groups of bondholders are involved in this controversy. Petitioner, Mary E. Morris, as a holder of bonds of the district in excess of $300,000, contends the district is insolvent and that the accumulated securities will not pay the bonds in full, and therefore all bondholders should be

treated equally, and the funds on deposit paid pro rata to bondholders, irrespective of bond maturity.

The interveners, a committee of bondholders, representing bonds in excess of $600,000, contend that the funds on deposit in the bond fund should be used to pay the bonds of the district in the order of their maturity. The district and its trustees are not legally interested as to the order of payment but are vitally concerned as to whether or not the district shall be determined to be insolvent.

To properly understand this controversy, we quote from our former opinion:

"At all the times mentioned in the proceedings in this cause Reclamation District No. 108 was, and now is a regularly organized and existing reclamation district under the laws of the state of California. The lands embraced within the exterior boundaries of the district aggregate approximately 60,000 acres.

"On December 8, 1923, there was levied upon the lands lying within the exterior boundaries of said district an assessment in the sum of $3,407,800.69, known as 'Assessment No. 5'. Thereafter, proceedings were had under the provisions of section 3480 of the Political Code, providing for the issuance of bonds upon the unpaid portion of said assessment which amounted to the sum of $3,142,000. On January 1, 1925, bonds were issued in the sum of $2,542,000, and on January 1, 1927, a further issue of bonds was made in the sum of $600,000, making a total of the bonds issued by said district of the sum of $3,142,000. The bond issues were secured by assessment No. 5. The bonds so issued began to mature on January 1, 1935, and on the 1st of January thereafter, until and including January 1, 1943, each of said series of bonds being in the total sum of $350,000, save and except the last maturing series, which was in the sum of only $342,000. Interest on said bonds was provided to be paid semi-annually, to wit: On July 1st and January 1st of each year, the interest being represented by coupons in the sum of $30 each.

"The petitioner alleges that she is the holder of bonds of said district based upon assessment No. 5, in the sum of over $300,000. The petitioner further alleges that she is the owner of unpaid matured coupons in the sum of $69,750. The petitioner further sets forth that under the provisions

of section 3480 of the Political Code, bonds have been employed by landowners in the discharge of said assessment in the sum of $1,378,000, and in buying lands at delinquent sales in the sum of $225,000, leaving the amount of said bonds unpaid in the approximate sum of $1,539,000.

"It further appears from the pleadings in this cause that under and by virtue of defaults in payment of installment calls based upon assessment No. 5, 20,020 acres have passed from the original owners into the ownership of the district; that approximately 20,000 acres have been eliminated from the burden of assessment No. 5 by reason of the employment of bonds, as heretofore stated, in the discharge of the assessment. That there now remains within the district lands paying assessment calls, an acreage of less than 20,000, estimated in some portions of the pleadings as being 17,500 acres.

"It further appears from the records in this cause that there are unpaid state and county taxes and other assessments, in a sum exceeding $200,000.

"At the date of the submission of this cause it appears from the allegations of the petition that there were unpaid and matured bonds as follows, to-wit:

| | |
|---|---:|
| "January 1, 1935 | $170,000 |
| January 1, 1936 | 228,000 |
| January 1, 1937 | 196,000 |

"The pleadings submitted by the interveners differ from the figures just set forth in the sum of $4,000. Unpaid interest coupons on said bonds are alleged as follows:

| | |
|---|---:|
| "January 1, 1935 | $54,442 |
| July 1, 1935 | 49,342 |
| January 1, 1936 | 49,342 |
| July 1, 1936 | 42,500 |

"The amount of interest falling due January 1, 1937, does not appear. The total of the five installment calls made by the district is the sum of $932,088.55, upon which it is alleged only the sum of $29,613.18 has been paid. That thereafter total redemptions amounted to the sum of $87,-875.97. The deficiency in the yield from the calls referred to is alleged by the petitioner to be the sum of $814,583.21. The accuracy of this calculation we have not verified, but the figures which we have set forth show that the deficiency is considerably in excess of half a million dollars.

"It is further set forth that the rentals or profits of the lands that had passed into the ownership of the district for the crop years of 1935 and 1936, yielded the sum of $141,000. Whether this sum includes all of the yield of crops for the year 1936, does not definitely appear, but it does represent the amount of money that was in the hands of the respondent, California Gibson, available for payment upon the obligations of the district, including, also, bonds and coupons.

"The complaints in intervention admit that the amount of money collected upon the respective calls of installments has been insufficient to pay the respective coupons and bond maturities, and likewise, that the moneys received for redemption of lands that have gone delinquent; also, that the amount of moneys received on account of rentals of the lands owned by the district added to the amount received upon the calls does not create a fund sufficient to discharge maturing bonds and coupons; and by way of defense it is further set forth that the moneys received from rentals should be applied to the payment of the earliest maturing coupons and bonds. The principal and interest of coupons maturing January 1, 1935, is fixed at the sum of $167,000, and total moneys received as rentals for the years 1935 and 1936, as heretofore stated herein, out of which sum it appears that the respondent, prior to the issuance of the alternative writ herein, had paid out on account of matured bonds a sum in excess of $100,000.

"Based upon what we have heretofore said the petitioner contends that the bond fund of Reclamation District 108 is hopelessly insolvent. As against the position taken by the petitioner it is insisted by the interveners that the value of the lands in the district is adequate to discharge all of the indebtedness heretofore mentioned; that approximately fifty per cent of the original issue of bonds has been retired, as herein set forth, in the use thereof by landowners in discharging the assessment.

"It is further argued that the provisions of the reclamation law of this state provide for supplemental assessments in the event that the original assessment upon which the lands are issued prove insufficient to fully discharge the same; that the installment calls are being paid on practically one-third of the indebtedness; and that other liens

are being discharged by the use of bonds of the district, greatly to the advantage of the district.

"It is also further stated by the intervening district that by the profits realized from the leasing of the lands belonging to the district, and the eventual sale thereof, it is hoped and believed that the indebtedness of the district will eventually be fully paid."

Since the filing of our original opinion we have had the aid of a comprehensive report of the referee, Mr. Charles Lumbard, a certified public accountant, who has audited and examined all of the books and records of California Gibson, County Treasurer of Colusa County and the Trustee of the Bond Fund of Reclamation District 108; the books and records of district 108, and has also conducted oral examinations as to values of lands of the district, and other pertinent matters. These examinations were taken before a stenographic reporter and have been transcribed and are filed in this court as a part of the records of this proceeding.

The report itself is too long to be here set forth in detail, but the summary as submitted by the referee will indicate briefly his findings as to the financial condition of the district:

"(a) The amount of the bonds of Reclamation District No. 108 issued and based upon Assessment No. 5 of said District outstanding on the 30th. day of June, 1937, the sum of ......................$1,615,201.95

"(b) The amount of said bonds and coupons thereof in default, June 30th, 1937.

Bonds .......................... 422,000.00

Coupons ........................ 281,250.00

"(c) The number of acres of land assessed under Assessment No. 5:

|  |  | Acres |
|---|---|---|
| (1) | which paid said assessment in full........ | 24,405.024 |
| (2) | which are still paying the assessment as called ............................. | 1,329.281 |
| (3) | which are redeeming delinquencies within the one year period.................. | 5,461.83 |
| (4) | which are owned by California Gibson, as Trustee of the Bond Fund of Trustee of Reclamation District No 108.......... | 23,049.93 |

(5) which are owned by Reclamation District
No. 108 .......................... 712.20

"(d) The amount of the assessment outstanding
and unpaid (including interest and pen-
alties) against the lands owned by the
County Treasurer as Trustee after ap-
plying all credits from crop rentals, etc.,
June 30, 1937 ..................... $1,910,555.75

"(e) The amount of money on deposit, which
can be applied to the payment of bonds
and/or coupons, and the amount of
money to become available during the
year 1937 by way of crops:

(1) In the Bond Fund in the County Treasury 263,310.74
(2) In the hands of the District............ 14,204.01
(3) Due on crops sold, 1936 and prior years.. 14,456.61
(4) Estimated value of 1937 crops........... 99,231.27
(5) Additional credit 1936 and prior years
crops ................................ ..1,589.38
(6) Additional credit 1937 crops........... 19,279.25

"(f) Statement of resources and obligations
show total resources ................ 3,357,482.28
Total obligations ........................ 2,618,297.53
leaving surplus of ....................... 739,184.75

"(g) The probable value per acre of all lands
owned by the District or which may
hereafter be owned by the District.... 112.50

"(h) The probable ability of the District through its Board
of Trustees to dispose of the lands is evidenced by
testimony taken at the hearing held February 15,
1938, in which the following points were brought out.

(1) All lands in District are built up by overflow from the
Sacramento River, the lower and rear part being
sandy clay and the river front loam mixed with
overflow and very productive.

(2) Irrigation water is taken from the Sacramento River
with ample supply at all times; during high water
gravity flow is used and during low water 5 pump-
ing plants are used with the result substantially all
lands can be irrigated with ample water at approxi-
mately 50c per acre foot, a cost as low or lower than

any other system in California, being classed "A1" by the Federal Land Bank Engineering Division.

(3) Lands are adaptable to the growing of fruits, vegetables, grain and rice.

(4) Rentals by the District have been chiefly on a crop basis and run for terms of one or two years (if summer fallowing is desirable, one year, if not, two years) and the price being paid is:

  (a) Grain: 1/3 to District and 2/3 to tenant. Tenant paying all expenses.

  (b) Rice: 1/3 to District and 2/3 to tenant. Tenant paying all expenses.

(5) The District has experienced no difficulty in renting the defaulted lands and applications to rent have exceeded the supply of land, the policy of the trustees being to lease the lands to former owners or to tenants of former owners.

(6) Conditions generally in the District have improved during the past five years, particularly since the late spring of 1936 when the Trustees placed the operation of the District on a cash basis, having no maintenance indebtedness in the form of outstanding warrants at the present time.

(7) The condition of the District is reflected in the market value of the bonds; at present they range from 60 cents to one dollar, while in 1931 they fell as low as 15 cents on the dollar."

This information contained in the report of the referee has changed our view as to the insolvency of the district, and we are of the opinion that this court should not at this time so hold.

In the first place such a conclusion should not be lightly assumed. Here we have a controversy between two groups of bondholders, one contending that the money in the bond fund be used to pay bonds in the order of their maturity, the other group contending the district is insolvent, and the funds should be paid proratedly to the holders of the bonds, irrespective of maturities; and in order to do that we are asked to declare the district insolvent. Surely the presentation of a matter so important to the landowners of the district should be so presented as to bring before the court

all the principals vitally concerned,—the landowner, the district and the creditor. The trend of modern legislation, as indicated in the enactment of *moratoria* and other protective barriers between the lender and the borrower, indicate an equal interest and concern, on the part of the state, in the well-being of the landowner and farmer as well as of the investor and the bondholder. However, we need not rest our reasoning upon that ground. ■ As long as the security for the bonds are adequate the bondholders must receive payments in accordance with their contract, one of the terms of which fixes the respective priorities of payment.

A purchaser of bonds may and probably often does deliberately select bonds of late maturity in preference to bonds maturing at an earlier date, and having made that selection he should not be permitted, without good reason, to now alter his position.

Under the provisions of section 3480 of the Political Code as it stood in 1923, it was provided:

" . . . Any parcel of land bid in and purchased by a treasurer as aforesaid, as trustee of the Bond Fund of the District, may be sold and conveyed by him or his successor in office at any time after the expiration of said redemption period of one year, at public or private sale and with or without notice to any person paying him the amount from which said parcel was bid in by said treasurer at delinquent sale, with interest thereon at the rate of seven per cent per annum, compounded yearly, from the date of said delinquent sale, and also the amount of all subsequent installments then delinquent, with accrued interest and penalties thereon."

In 1931 this section was amended providing for a method of sale as set out in section 3466a of the Political Code. This latter section stipulated that "no parcel of land shall be sold for an amount less than the fair market value thereof as such value shall be ascertained by the Board of Trustees".

The constitutionality of this method of sale as applied to bonds issued prior to the date of the amendment was considered in *Rivers Farm Co. of California* v. *Gibson*, 4 Cal. App. (2d) 731 [42 Pac. (2d) 95]. This court, speaking through Mr. Justice Plummer, said in regard to that matter:

"As said in the opinion just referred to (*State* v. *Board of Commissioners, etc.*, 89 Mont. 37 [296 Pac. 1]) it is fair

to assume that no purchaser could or can be found who is willing to pay more than the fair market price of the land offered for sale. If that is true, then no infringement would occur against any contractual rights. Such a sale, bringing the land back into the taxing column, would enhance rather than militate against the interest of the bondholders as well as the interest of the general public, and also every person interested in the financial condition of the district, no matter what the capacity. . . . As is said in the case of *City of Beatrice* v. *Wright*, 72 Neb. 689 [101 N. W. 1039, 1043]: 'To say that such property cannot be sold for what it is worth in the markets, even though for a less sum than the assessments against it, is to defeat the very object of taxation, and lead to results the Constitution itself sought to avoid. Unless the property can be sold for its market value the result would be to exempt the property from all taxation for all time. This, of course, is an absurd result, and any construction leading thereto would be clearly inadmissible.' . . . The above decisions are based upon constitutional provisions substantially the same as that of our own, above mentioned.''

This conclusion was approved by the Supreme Court in *Morris* v. *Poundstone et al.*, 9 Cal. (2d) 485 [71 Pac. (2d) 262].

It would therefore appear that the several parcels, the title to which is vested in the treasurer, can now be sold at any time for their fair market value, at least as far as the law is concerned, thus making available land appraised at $2,325,000 for bond reduction. This value was found by the referee from the testimony of three disinterested, qualified experts on the values of lands in district 108, who appraised these lands so owned by the district at $112.50 per acre, or a total valuation of slightly in excess of $2,325,000.

■ One of the financial loads upon district 108, as to which petitioner claims the referee failed to emphasize, is the overlying indebtedness of Knights Landing Drainage District and West Side Levee District. If, however, assessments are called by these two districts, and the same not paid until the lands of district 108 are sold, then the purchaser of the lands of district 108 will take title free of the liens of those bodies.

Statutes of 1915, chapter 361, page 516, creating Sacramento West Side Levee District, provided that upon the sale of delinquent properties the deed conveys said property "free of all liens and encumbrances, excepting state, county and municipal taxes, and the liens of assessments now levied or which may hereafter be levied by any of the Reclamation Districts situate within said levee district . . . ". (Page 526.) So, also, in the creation of the Knights Landing Drainage District. (Stats. 1913, chap. 99.) This also insures that if assessments are called by the levee and drainage districts before the lands of district 108 are sold, that the proceeds from the sale of the reclamation district lands will go in their entirety into the bond fund of the reclamation district.

In *South San Joaquin Irr. Dist.* v. *Neumiller*, 2 Cal. (2d) 485 [42 Pac. (2d) 64], it is held, one possessing a right of redemption does not have such a vested right in the method or conditions adopted by the statute for the disposition of its tax deeded lands as will prevent the state from changing the terms of sale after it has received title. The legislature, in the absence of constitutional limitations, may dispose of tax deeded lands in any way deemed to be in the public interest. Here the title has passed to the trustee, free and clear of liens of the levee and drainage district.

A further fact appearing in the record is that the trustees are now operating upon a cash basis.

We do not believe that the temporary embarrassment of district 108 justifies a departure from the ordinary and usual method of retiring its warrants.

In considering this problem we may also consider the effect upon the holders of all bonds that the application of the policy sought by petitioner would have, and while such effect is not controlling, it is worthy of consideration. If the holder of an obligation not yet due may receive payment on account while the holder of a past due obligation is refused payment in full then a great many actions would have to be filed to prevent obligations being outlawed under the four-year statute, thereby penalizing the holders thereof for attorney fees, court costs and interest charges, while the holders of the unmatured bonds would be receiving a part of their principal and also collecting interest as evidenced by coupons on principal which would be paid in part

prior to maturity of the coupons. That is not equitable to the landowner nor the holders of past due paper.

All the land which has passed to the district still belongs to the district. If the crop proceeds can retire some of the matured bonds, no security has been lost to petitioner, but on the other hand obligations prior to hers have been diminished, and she still can look to the original security unimpaired.

Inasmuch also as the bonds of district 108 are superior to Sacramento West Side Levee District and Knights Landing Ridge Drainage District, the proceeds from the sale of these lands would go in their entirety into the bond fund. The only claim of equal standing with the bond charges would be the lien of state and county taxes, which, under an agreement between the proper authorities (sec. 3897d, Pol. Code) have been discharged it is asserted at approximately twenty-five cents on the dollar, exclusive of penalties.

In view of the conditions here existing the principle declared in *State* v. *Duncan,* 334 Mo. 733 [68 S. W. (2d) 679], which case has been approved in *Bank of Hawaii* v. *Gibson,* 15 Cal. App. (2d) 407, 413 [59 Pac. (2d) 559], and in *Kerr Glass Mfg. Co.* v. *San Buenaventura,* 7 Cal. (2d) 701 [62 Pac. (2d) 583], are here applicable. There the Supreme Court of Missouri had before it a financial condition somewhat similar to the present situation, and was confronted by the same argument. It there held, however, that where a drainage or reclamation district is temporarily embarrassed but not permanently insolvent,—that is when given a reasonable time, it will discharge its obligation,—the owners of matured bonds are entitled to share *pro rata* in the funds on hand while the owners of unmatured bonds must wait the maturity of their obligations. In that case it was admitted that there was $187,500 par value of bonds due and unpaid. The total issue was $630,000. An owner of certain matured bonds to the amount of $33,000 commenced an action to enforce payment in full of his bonds and interest. The court said, however, that notwithstanding the delinquency and temporary embarrassment of the reclamation district, since the pleading admitted that ultimately out of delinquent taxes, collections and future tax levies, the bonds and coupons would be paid in full, that the holders of overdue paper, and

not unmatured paper, could participate *pro rata* in the disbursement of the moneys on hand. We quote:

"If a drainage district be insolvent, as held in the *Sturdivant Bank Case, supra*, 334 Mo. 753 [68 S. W. (2d) 671], all outstanding bonds (those not due as well as those matured) must be taken into consideration in the apportionment of the fund. If the district is solvent there still must be apportionment, but it is limited to matured bonds and coupons because in that situation the statute pledges the fund on hand from time to time to the payment of matured (and after that next maturing) principal and interest. We understand this view to be in accord with the following decisions which we cited in the *Sturdivant Bank Case, supra*, and here refer to again: *Rothschild* v. *Village of Calumet Park*, 262 Ill. App. 96, 106; *Thomas* v. *Patterson*, 61 Colo. 547 [159 Pac. 34]; *Norris* v. *Montezuma Valley Irr. Dist.*, (D. C.) 240 Fed. 825; *Norris* v. *Montezuma Valley Irr. Dist.*, (C. C. A.) 248 Fed. 369; *Rohwer* v. *Gibson*, 126 Cal. App. 707 [14 Pac. (2d) 1051]."

A review of these several Missouri decisions and an approval of the above rule of the Duncan case is contained in *Groner* v. *United States* and *Bliss* v. *United States* (73 Fed. (2d) 126). That ruling is also quoted and followed in *Malone* v. *Moore*, 46 Ariz. 452 [52 Pac. (2d) 467, 472].

Petitioner further argues that the crop moneys, because they accrue at uncertain dates, should not be used for the payment of bond obligations in the order of their maturity, but considering this question Mr. Justice Plummer quite specifically disposed of this contention in *Cooper* v. *Gibson*, 133 Cal. 532, 542 [24 Pac. (2d) 952], saying:

"As to the appropriation of the moneys received from the leasing or operation of lands, the titles to which have become vested in the district, it would appear that the money so received should be first applied to the payment of the interest due coincident with the period when the installment intended for the payment of such interest became delinquent. This would seem to be the intention of the legislature by the language used in paragraph 3480, *supra*, wherein the treasurer, in making his estimate of the amount necessary to pay interest and principal maturing on any date, is directed to credit such funds in the treasury to the payment

of such interest and principal. In other words, the amount on hand so received is to be applied to the payment of the interest and principal falling due, to pay which the installment call is made and becomes a part of the fund available for such purpose.''

It is apparently not the contention of petitioner that the district is today insolvent. Her apprehension is based upon past performance of landowners meeting their assessments and the withdrawal of lands from a tax revenue basis, by reason of its passing into the possession of the treasurer. She is also fearful that the mounting sums for penalties, interest, and delinquent state, county, drainage and levee districts will absorb all of the income, leaving an inadequate amount for debt reduction. She disregards the possible revenue from the sale of lands and the added benefits of getting the land back upon a tax paying basis. She disregards the possible future rentals from the lands belonging to the district, which has been shown by the report of the referee to have amounted to a very substantial sum over the past year. She seems to overlook the fact that the referee has determined a surplus of $739,000 exists.

In view of the evidence now before us we cannot say as a matter of law or fact that district 108 is insolvent. Furthermore, section 3480 of the Political Code authorizes the levying of a supplemental assessment to care for any unpaid principal or interest in the event the original assessment is found insufficient at the end of the bond period, in this case in 1943. This constitutes a further asset of the district, inuring to the benefit of petitioner. In considering this provision an asset we have not overlooked the principle that assessments of a reclamation district are levied according to the estimated value of the benefits to accrue, and that when the collection of taxes has reached the value of the benefits conferred upon the lands in a district, there is then no legal provisions for the placing of additional burdens. (*Rohwer* v. *Gibson*, 126 Cal. App. 707 [14 Pac. (2d) 1051].) We cannot, in view of the testimony before us, now declare that district 108 has reached the limit of its assessable values. To so hold here would be purely speculative.

In examining the findings of the referee, petitioner claims that the referee's estimates of anticipated income are too

high and that certain charges which should have been made were omitted. On the other hand, counsel for the district claims that the referee is too conservative, and that credits not considered should be included. As to those matters we do not know, but very probably the truth lies somewhere between these two contentions, and we are accepting the report of the referee as giving a fair statement of the actual conditions.

We do not believe we need say more. The various parties before the court are represented by able counsel and many points are raised, but the primary issue here is as to the apportionment of the moneys in the hands of the treasurer derived from crops produced upon lands taken over by the district. As to that we are of the opinion, as stated before, that the funds on deposit in the bond fund should be used to pay the bonds of the district, in the order of their maturity.

The peremptory writ sought by Mary E. Morris, petitioner herein, is denied. Pursuant, however, to the prayer of interveners Frederick F. Cooper et al., it is ordered that a peremptory writ of mandate issue out of this court directed to the respondent county treasurer, as trustee of the bond fund of Reclamation District 108 and of said district, requiring her as such trustee,

1. From the funds now on deposit in the special fund of the bond fund of Reclamation District No. 108 created for the purpose of paying the principal of bonds of Reclamation District No. 108 that matured on January 1, 1935, *to pay* the principal in full of all outstanding bonds of said maturity to the holders thereof;

2. From the funds now on deposit in the special fund of the bond fund of Reclamation District No. 108 created for the purpose of paying all interest coupons that matured on January 1, 1935, *to pay* all said dated coupons now outstanding to the holders thereof in full;

3. From the funds now on deposit in the special fund of the bond fund of Reclamation District No. 108 created for the purpose of paying all interest coupons that matured on July 1, 1935, *to pay* all said dated coupons now outstanding to the holders thereof in full;

4. *To create and maintain* a special fund for each delinquent maturity of said bond issue. Where both bonds and coupons mature on the same date but a single fund shall be created for such date, and in such fund such matured principal and interest obligations shall be treated on a parity;

5. To *deposit* in said respective funds the following moneys in the following manner, to wit:

(a) All moneys collected upon the calls of instalments of said assessment securing said bond issue shall be deposited in the special fund created for the payment of the maturity of coupons or the maturity of coupons and bonds, as the case may be, for which the call was made, together with all moneys realized by way of purchase price of lands sold to third parties at delinquent assessment sales held to pay such delinquent instalments, and together also with all moneys realized through redemption by landowners of lands sold to the respondent at such delinquent assessment sales for the payment of such delinquent instalments;

(b) All moneys realized and received from rentals of the lands owned by the respondent, as such county treasurer and as such trustee for the bond fund of Reclamation District No. 108 and for said district, shall be deposited in the special fund created for the payment of the first maturing delinquent coupons or bonds and coupons, as the case may be, in amount sufficient to satisfy the deficiency therein, and the surplus, if any, then shall be deposited in the special fund created for the payment of the next maturing coupons or bonds and coupons, as the case may be, and so on until said funds are exhausted;

(c) All moneys realized from the sale of delinquent lands owned by respondent as such county treasurer and as such trustee shall be deposited in the special funds in the same manner as that above provided for the deposit of rental or crop moneys.

6. Whenever and as often as the sums in any of said special funds shall be sufficient to pay twenty-five per cent (25%) of the obligations for the payment of which said special funds are created, as aforesaid, the said county treasurer shall make distribution out of said fund to the holders of said obligations of said sum *pro rata*, endorsing said matured

bond or coupon, as the case may be, with the date and amount of such payment.

Each party hereto, except respondent, to bear one-third of the costs; that is to say: one-third of the costs is hereby charged and assessed to Mary E. Morris, petitioner, one-third to interveners Reclamation District No. 108 et al., and one-third to interveners Frederick F. Cooper et al.

Thompson, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on March 9, 1939, and an application by petitioner to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on April 6, 1939.